577 F.2d 344
 In the Matter of A. G. LOVE, Jr. and Christine L. Love, Bankrupts.
A. G. LOVE, Jr. and Christine L. Love, Appellants,
v.
TOWER LOAN OF MISSISSIPPI, INC., d/b/a Tower Loan of
Southwest Jackson, Appellee.
 No. 76-4150.
 United States Court of Appeals,
Fifth Circuit.
 July 31, 1978.
 
 Fred A. Ross, Jr., Jackson, Miss., for appellants.
 Robert R. Marshall, Jackson, Miss., for appellee.
 L. Breland Hilburn, Jackson, Miss., for other interested party.
 Appeal from the United States District Court for the Southern District of Mississippi.
 Before TUTTLE, GEE and FAY, Circuit Judges.
 TUTTLE, Circuit Judge:
 
 
 1
 The appellants are here seeking reversal of a judgment of the district court, sitting in bankruptcy, denying the discharge in bankruptcy of an indebtedness representing a loan made to the bankrupts by Tower. The district court judgment reversed as clearly erroneous the findings of fact by the bankruptcy judge, who, on three separate occasions, made specific findings that the bankrupts had not offended any of the requirements of the bankruptcy laws and who concluded, therefore, that they were entitled to have this indebtedness discharged. The bankruptcy judge also imposed a $750 attorney's fee on the objecting creditor for harassing conduct and the trial court also set this aside.
 
 
 2
 The Loves raise two main points with respect to the dischargeability of the indebtedness. The first is that the bankruptcy laws require that the court shall make an order fixing a time for the filing of objections to the bankruptcy discharge and a time for the filing of applications to determine the dischargeability of particular debts; that the objection here was not filed within the time limit set by the bankruptcy court; that the court did not enter any order enlarging the time; therefore, under the language of the statute since the application was not "timely filed, the debt shall be discharged." 11 U.S.C. § 35(c)(2). The second contention of appellants is that the findings of fact made by the bankruptcy judge were amply supported by credible evidence, that credibility choices were made by the judge, and that on the record before it, the district court could not properly find that these determinations were clearly erroneous.
 
 
 3
 We deal first with the argument by the appellants that since Tower admittedly filed its complaint challenging dischargeability after the deadline set by the bankruptcy court, the language of the statute mandates the dismissal of the complaint. The difficulty with this argument is that § 14(b)(1), the section which controls the setting of time, states that the court "may, upon its own motion or, for cause shown, upon motion of any party in interest, extend the time or times for filing such objections or applications." § 14(b)(1), 11 U.S.C. § 32(b)(1). Under the provisions of this rule, the fact that the court received the complaint and held a hearing on it without any formal objection by the bankrupts is sufficient, we think, to constitute an extension of time by the court. It is only if the creditor's application is not timely filed within the extended time that there is a mandatory dismissal of the objections. We conclude, therefore, that the bankruptcy court had jurisdiction to consider the complaint.
 
 
 4
 We need not reach the question whether the district court could, on the record before it, expressly reverse the findings of fact and conclusions of law drawn therefrom by the bankruptcy judge. This follows from the fact that both parties, the bankruptcy court, and the district court all seem to have misapprehended the meaning of § 17 of the Bankruptcy Act (11 U.S.C. § 35).
 
 
 5
 It must be borne in mind that we are not here dealing with the right of a bankrupt to a discharge, a subject which is dealt with under § 14 of the bankruptcy laws (11 U.S.C. § 32). Rather, we are dealing only with § 17 (11 U.S.C. § 35), that part of the statute which deals with particular debts which are not affected by a discharge. So far as relevant to this case, this section provides as follows:
 
 
 6
 § 35. Dischargeability of debts Debts not affected by discharge
 
 
 7
 (a) A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . .
 
 
 8
 (2) are liabilities for obtaining money or property by false pretenses or false representations . . . or for willful and malicious conversion of the property of another . . . .
 
 
 9
 The entire case sought to be made out by Tower in its complaint is based on its contention that it held a secured note of the Loves; that after Loves' bankruptcy, its representatives sought to find the chattels that secured the note; and that they were not to be found. Some of the household goods itemized in the security agreement were no longer on hand, and 22 head of cattle, specified only by color, were missing, except for two head. Tower further claimed that a pledged tractor was not to be found.
 
 
 10
 The complaint alleged that at the first meeting of creditors, a conflict between secured creditors arose, specifically regarding the cattle mentioned as collateral. It alleged that "the bankrupts stated, however, that all the cattle were located in Simpson County." The complaint then alleged that:
 
 
 11
 Subsequent to the entry of said order, plaintiff attempted to gain possession of collateral. Defendants, individually and by and through their attorney, stated that they no longer had possession of the collateral and refused to inform plaintiff of the location of the collateral at the present time. Plaintiff was further informed by the defendants that the location of the tractor is unknown to the defendants, and that they do not now have the possession of the furniture listed as collateral.
 
 
 12
 The complaint then alleged in paragraph 5 that:
 
 
 13
 Defendants, during the twelve months immediately preceding the filing of the petition in bankruptcy, and during and after the filing of the petition in bankruptcy, have transferred, removed, destroyed, concealed or permitted to be removed, destroyed or concealed, collateral pledged to the plaintiff with the intent to hinder, delay or defraud said plaintiff.[1]
 
 
 14
 The final allegation of the complaint was that "defendants have wholly failed to satisfactorily explain the loss of the listed collateral."
 
 The prayers were then worded as follows:
 WHEREFORE, premises considered:
 
 15
 A. Pursuant to Section 14B-1 of the Bankruptcy Act, plaintiff moves the Court to extend the time for filing a complaint objecting to the discharge of the bankruptcy.
 
 
 16
 B. On hearing of this complaint and pursuant to Section 17A-2, -4, and -8, the defendants be held not released from their indebtedness to the plaintiff, and that the indebtedness to the plaintiff be held non-dischargeable.[2]
 
 
 17
 The first thing that must be said, then, is that the complaint itself does not even allege any ground for non-dischargeability of this individual debt. Even if it could be said that the claim that collateral for a secured loan was missing amounted to an allegation that this was a willful and malicious conversion of Tower's property, that would be a conversion after bankruptcy; it would not have created a "provable" debt dischargeable in bankruptcy, which is all § 17 deals with.
 
 
 18
 The only alleged provable debt owed by the Loves to Tower was on the promissory note. There was no provable debt which was a "liabilit(y) . . . for willful and malicious conversion of the property of another." § 17(a)(2). It is clear that it is only where the debt whose discharge is opposed arose from an act of the bankrupt which created a liability for willful and malicious conversion of the property of another that such debt is not subject to discharge. This section has nothing to do with the conduct of the bankrupts after bankruptcy. Tower has not alleged an indebtedness owed by the Loves based upon any false or fraudulent representations nor has Tower asserted any claim against the Loves based upon willful and malicious conversion of the cattle or the Massey Ferguson tractor in such a manner as to create a provable debt based on such liability at the time of bankruptcy. As already stated, the only debt claimed by Tower is the debt on the promissory note. This is not the sort of liability covered by § 17(a)(2).
 
 
 19
 This complaint was never amended. It is not disputed that at the first meeting of creditors, the debtor stated that the cattle were in a field some distance away from his home and that the fence was down and the cattle might wander off, but that the bankruptcy judge told him that it was not his responsibility but that of Tower to protect the cattle from loss. Several months later when Tower first attempted to check up on the livestock, it found only 12 head of cattle, 10 of which Love claimed to have purchased subsequent to bankruptcy.
 
 
 20
 Mrs. Love testified that most of the furniture listed as collateral had been discarded before the loan was executed. She stated that they had made several earlier loans with Tower and that apparently Tower may have transferred the list of items of furnishings from one note to the next one. She accounted for several particular items as having worn out and having been carted to the dump, and as to others she said they were worn out or had been broken and had been thrown away. She said that the family had moved to a different house from the time this list of furniture had originally been made up. The bankruptcy court accepted this statement as absolving the Loves from any failure to produce any of the items of household furnishings. The court made findings of fact including the following:
 
 
 21
 (2) The Court finds that the plaintiff wholly failed to prove a prima facie case of fraud on the part of the bankrupts, and the complaint is frivolous and devoid of merit.
 
 
 22
 (3) The Court finds that the plaintiff wholly failed to prove any other material allegations of the complaint as to any acts, or omissions of acts, by the bankrupts that would render the debt to the plaintiff nondischargeable.
 
 
 23
 The court found that two head of cattle belonged to the plaintiff and that they should be subsequently identified. The court accepted Love's statement that the tractor securing the promissory note was an old tractor that had been abandoned at a repair shop on account of the charge for repairing it.
 
 
 24
 The burden of proving nondischargeability was on Tower, and proof of one of the specified types of wrongdoing was an essential element under § 17(a)(2) of the Bankruptcy Act on which Tower relied. The bankruptcy judge resolved the credibility issues in Loves' favor and accepted their version of the story. In a subsequent opinion, the judge said that Tower was on notice about the fence and was negligent in not repairing it. There had been no fraud and no willful or malicious conversion within the meaning of § 17(a)(2).
 
 
 25
 On appeal, the district court reprimanded the Loves for their failure to exert themselves to round up the collateral. Holding the discharge issue in abeyance, the court ordered them to assemble the collateral and present it to Tower as their security agreement required. The opinion overlooked the fact that Tower had admitted that they had never tried to pick up the collateral.
 
 
 26
 Back in the bankruptcy court, a clearly unhappy bankruptcy judge continued to deal with what was becoming a very tiresome proceeding. In response to the order of the district court, the Loves managed to assemble only a broken TV and two lamps of the items listed. The two cows which belonged to Tower had meanwhile been sold. After a hearing on whether the Loves should be held in contempt, the bankruptcy judge continued to believe them, holding that they had done their best and recognizing that old furniture and old tractors wear out. The court again found that the tractor put up as collateral was an old one bought from a farmer and that it had been in the repair shop at the time of the loan, as Tower had known. The money advanced by Tower to Massey Ferguson was used not to buy a new tractor, but to pay for other equipment in which Tower had failed to take a security interest. The court held that there was no fraud or conversion with respect to the household goods and the tractor.
 
 
 27
 By this time many hearings had been held and the bankruptcy judge had become quite exasperated by what he considered Tower's efforts at harassment. He sought to recuse himself, but the district court refused to permit it. At this late juncture, when the bankruptcy judge was seeking evidence of the cows' fair market value, Tower tried to present additional evidence on the issue of dischargeability. Tower took depositions to attempt to show that the Loves had indeed bought a new tractor back in 1973 and had been paying on it throughout 1975. Tower wanted the court to consider this evidence but the court refused. There was no showing of why Tower had been unable to produce this evidence earlier when the hearings on fraud and conversion were held.
 
 
 28
 Around this same time Tower submitted a request for admission as to the cattle's fair market value. The court acknowledged receipt of the request by shortening the time for Loves' response, but did not require reopening the evidentiary proceedings.
 
 
 29
 In its "final" order and supplemental order in June 1976, the bankruptcy court reiterated its earlier holding that Tower had failed to prove willful conversion; hence, the debt would be discharged. Any conversion of the two Tower cattle had been merely technical because Love was merely following the court's order (presumably not to mend the fence) and because of Tower's lack of interest in the cattle. The court questioned Tower's motives in pursuing this litigation to such an extent, especially after Love had offered to reaffirm the debt, an offer which Tower rejected.
 
 
 30
 The court found that Tower had caused groundless, vexatious, and oppressive litigation in bad faith. Attorneys' fees were awarded to Loves in the amount of $750.
 
 
 31
 The bankruptcy court's decision was appealed to the district court. In its opinion, the district court found each of the findings below clearly erroneous: the Loves had "wantonly" converted the collateral and were not entitled to a discharge; their testimony was incredible and contrary to physical facts; the "record" clearly showed that there had been a new tractor which had not been accounted for. Apparently the court considered the notion of escaping cows preposterous. The award of attorneys' fees was likewise reversed because of lack of bad faith and want of authority under the bankruptcy laws. The court found that Tower had met its burden of proving false pretenses in securing the loan (a matter not claimed in the complaint) as well as a willful and malicious conversion (also not alleged in the complaint).
 
 
 32
 The statute, the bankruptcy rules and court decisions control our review of these proceedings. In the first place, as we have already indicated, objection to the dischargeability of a particular indebtedness must be based on one of the specified grounds contained in § 17(a) of the Bankruptcy Act. Unless an objecting creditor can bring himself within the language of this section, a general charge of dishonest conduct by the bankrupt does not suffice. Collier's Treatise on Bankruptcy states: "In view of the well known purposes of the bankruptcy law, exceptions to the operation of a discharge thereunder should be confined to those plainly expressed therein." IA, Collier, Bankruptcy, § 17.02, at 1581 (14th ed. 1976).
 
 Then, Bankruptcy Rule 810 provides:
 
 33
 Upon an appeal the district court may affirm, modify, or reverse a referee's judgment or order, or remand with instructions for further proceedings. The court shall accept the referee's findings of fact unless they are clearly erroneous, and shall give due regard to the opportunity of the referee to judge the credibility of the witnesses.
 
 
 34
 Finally, courts have uniformly held as has this court that: "The provisions of § 14(c) of the Bankruptcy Act, relating to discharge, must be construed liberally in favor of the bankrupt." Spach v. Strauss, 373 F.2d 641 (5th Cir. 1967). See also, In re Jones, 490 F.2d 452 (5 Cir. 1974). In all logic, the same concern for the bankrupt requires that § 17(a) be given the same liberal construction.
 
 
 35
 Although we have given a fairly full outline of what transpired in the bankruptcy court, we have already stated that we do not face the problem of deciding whether on the record before it, the district court could legally find the bankruptcy judge's findings of fact "clearly erroneous" since nothing that happened to the collateral for the loan after bankruptcy could convert a dischargeable debt into one that could be denied discharge. It is only the circumstances surrounding the creation of the debt that determine whether it is one that is not affected by the bankruptcy under § 17(a). It makes no difference, therefore, whether the trial court was correct in reversing the findings of the bankruptcy judge that there was no willful and malicious conversion and that there was no fraud committed by the Loves, since even if the district court was correct, there would still be a failure on the part of Tower either to allege or prove the requirements under § 17(a)(2). It was, of course, equally unimportant for the bankruptcy judge to have made his findings of fact respecting these issues. This is so because, as we state again, these facts dealt only with what happened to the property subsequent to bankruptcy.
 
 
 36
 We are forced to conclude, as did the bankruptcy court, that Tower failed to prove any conduct on the part of the bankrupts that created a debt arising from a liability of the kind described in § 17(a)(2). Moreover, we conclude that Tower did not even allege the facts giving rise to any such debt. The order of the bankruptcy judge denying the relief sought in the complaint was therefore correct and the judgment of the trial court denying the discharge of the Tower debt was in error.
 
 
 37
 After numerous hearings, dealing with irrelevant subject matter, as we have already indicated, the bankruptcy judge assessed the small attorney's fee against the complaining creditor. The district court vacated this judgment as well. The setting aside of the attorney's fee appeared originally in the court's original order as being based upon its understanding that a bankruptcy court did not have the power to authorize such a payment. The court said:
 
 
 38
 There is absolutely nothing to be found anywhere in this record to entitle the bankrupts' attorney to a fee to be paid by this creditor. No statute has been called to the attention of this court which would authorize the referee to award these bankrupts an attorney's fee against this creditor. That award will be reversed, vacated and annulled.
 
 
 39
 Subsequently, the court called on counsel for the prevailing party to prepare and present to the court "a proper judgment within five days after this date in accordance with this opinion, accompanied by a clear and concise finding of facts and conclusions of law not exceeding three pages." Following proposed findings by counsel there now appears in the final judgment of the court a finding of fact No. 9 as follows: "The appellant, Tower, did not act in bad faith in pursuing collection of the indebtedness of A. G. Love, Jr. and Christine Love to Tower." The district court thus reversed the findings of fact by the bankruptcy judge who expressed his reasons for the allowance of the attorney's fee in the following language:
 
 
 40
 The Court, in numerous hearings, was asked again to award attorney fees as part of the cost of this action to the attorney for the bankrupts. Evidence adduced at the last hearing held herein and, especially, the admission under oath of the attorney for Tower Loan that the bankrupts had made an offer to reaffirm the obligation in full more than a year ago and that said offer was rejected, lead the Court to believe that the motivations of Tower Loan were something other than that of recovering the money that was loaned before this bankruptcy was filed. Therefore, the Court finds that the actions of Tower Loan have been totally in bad faith for the purpose of harassment of the bankrupts, all in clear violation of the letter and spirit of the Bankruptcy Act.
 
 
 41
 During the proceedings before this Court, the Court announced that it had developed an attitude of prejudice toward Tower Loan. At the time of this announcement, the Court felt that Tower's relentless pursuit of this litigation resembled an effort to seek a pound of flesh rather than have the debt paid and attempted to deprive the bankrupts of one of the primary purposes for which the Bankruptcy Act was enacted:
 
 
 42
 "This Court on numerous occasions has stated that '(o)ne of the primary purposes of the bankruptcy act' is to give debtors 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' Local Loan Co. v. Hunt, 292 U.S. 234, 244 (54 S.Ct. 695, 78 L.Ed. 1230) (1934). Accord, e. g., Harris v. Zion's Savings Bank & Trust Co., 317 U.S. 447, 451 (63 S.Ct. 354, 87 L.Ed. 390) (1943); Stellwagen v. Clum, 245 U.S. 605, 617 (38 S.Ct. 215, 62 L.Ed. 507) (1918); Williams v. United States Fidelity & Guaranty Co., 236 U.S. 549, 554-555 (35 S.Ct. 289, 59 L.Ed. 713) (1915)." Perez v. Campbell, 400 U.S. 818 (91 S.Ct. 71, 27 L.Ed.2d 45) (1971).
 
 
 43
 The testimony of the attorney for Tower Loan appearing at p. 81 of the Transcript of the March 29, 1976, hearing is a clear demonstration of the creditor's bad faith and is commented upon here as justification of any prejudicial feelings developed by the Court. TR 81:
 
 
 44
 " . . . Now, just in order to also clear the record, there were some negotiations there were some negotiations made as far as reaffirming was concerned. The offer was they were going to reaffirm and pay off the indebtedness as pursuant to the original terms of the contract. It was rejected. There's no requirement that any loan company or any secured creditor accept such pay off. Collateral did exist at that time, it still does exist somewhere, that belonged to this creditor, I made the statement, 'We wanted our collateral.' . . . "
 
 
 45
 As to this part of the case, we must decide whether the district court could, on the record before it, determine that the bankruptcy judge was clearly erroneous in his determination "that the actions of Tower Loan had been totally in bad faith for the purpose of harassment of the bankrupt," especially in light of the bankruptcy rule 810 which requires that the district court "shall give due regard to the opportunity of the referee to judge the credibility of the witnesses." Without attempting in any way to explain the basis of its disapproval of the findings by the bankruptcy court which were supported by elaborate explanation of his reasons for determining the presence of harassment, the district court was satisfied merely to overrule these findings. We do not hesitate to determine that on this record it was an abuse of discretion by the district court to determine that the bankruptcy judge's findings were "clearly erroneous" as to the awarding of the attorney's fees.
 
 
 46
 We must still consider the power of the court to award an attorney's fee in the event of the existence of bad faith. The parties here agree that the power of the bankruptcy court with respect to the allowance of attorneys' fees is that possessed by a federal court of equity. The appellants rely upon § 2(a) (18) of the Bankruptcy Act as providing the authority which it exercised here:
 
 
 47
 . . . (t)ax costs and render judgments therefor against the unsuccessful party, against the successful party for cause, in part against each of the parties, and against estates, in proceedings under this (Act).
 
 
 48
 Collier comments on this section by saying:
 
 
 49
 . . . While § 2a(18) does not specifically authorize the taxing of attorney's fees as costs, neither does it prohibit the allowance, and the attorney's fees may be awarded within the exercise of the equitable powers of the bankruptcy court when not inconsistent with the Bankruptcy Act. Thus, a referee's award of costs to the prevailing trustee in a restoration action has been upheld. In re Swofford (D.Minn.1952) 112 F.Supp. 893.
 
 
 50
 The last words said by the Supreme Court with respect to the power of a court of equity to assess attorney's fees under the special circumstances that we find exist here is found in Alyeska Pipeline Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). As all are aware, Alyeska put an end to a claim for attorneys' fees by the prevailing party on the theory that he was acting as a "private attorney general." The Court expressly reaffirmed what it called the "American rule" that "the prevailing litigant is ordinarily not entitled to collect a reasonable attorney's fee from the loser." 421 U.S. at 247, 95 S.Ct. at 1616. Nevertheless, the Court made plain that there are exceptions embodied in the "American rule." The Court said:
 
 
 51
 Also, a court may assess attorneys' fees for the "willful disobedience of a court order . . . as part of the fine to be levied on the defendant(,) Toledo Scale Co. v. Computing Scale Co., 261 U.S. 399, 426-428 (43 S.Ct. 458, 465-466, 67 L.Ed. 719) (1923)," Fleischmann Distilling Corp. v. Maier Brewing Co., supra, 386 U.S. (714) at 718 (87 S.Ct. (1404) at 1407, 18 L.Ed.2d 475;) or when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . .;" F.D. Rich Co. v. United States, 417 U.S. 116 at 129 (94 S.Ct. (2157,) at 1265, 40 L.Ed.2d 703) . . . . These exceptions are unquestionably assertions of inherent power in the courts to allow attorneys' fees in particular situations, unless forbidden by Congress, but none of the exceptions is involved here.
 
 
 52
 421 U.S. at 258, 95 S.Ct. at 1622.
 
 
 53
 The Court's reference to the exception where a losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons" makes it clear that in such a situation, a court of equity has such authority. Since we have concluded that the bankruptcy judge's finding of fact dealing with the bad faith, vexatious and harassing conduct of the objecting creditor was amply supported by the record and must therefore stand, it was error for the trial court to set aside this part of the bankruptcy judge's order.
 
 
 54
 The judgment of the district court is reversed and the case is remanded for the entry by that court of a judgment affirming the judgment of the bankruptcy court.
 
 
 55
 REVERSED and REMANDED.
 
 
 
 [1]
 It is to be noted that this paragraph does not allege any ground for denial of discharge of a single debt. It is language suitable only under § 14 dealing with a bankrupt's discharge
 
 
 [2]
 Only § 17(a)(2) could arguably be relevant here. It is plain that neither provision 4 nor 8 have any application to the facts either alleged or proven here