In the matter of Arch P. PETTIT and Ida Marie Pettit, his wife, d/b/a Archangel Corporation, La Pettit Roche, Quapaw Quarter Shops and Ener-Kleen, Debtors.

STATE OF TENNESSEE, Plaintiff,

v.

Arch P. PETTIT, Defendant.

Bankruptcy No. LR 80–627.
Adv. No. 80–446.

United States Bankruptcy Court,
E. D. Arkansas, E. D.

Nov. 21, 1980.

William M. Barrick, Asst. Atty. Gen., Nashville, Tenn., for plaintiff.

Isaac A. Scott, Jr., Little Rock, Ark., for defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL JUDGMENT AND DECREE DECLARING THE DEFENDANT'S LIABILITY TO PLAINTIFF TO BE DISCHARGEABLE IN BANKRUPTCY

DENNIS J. STEWART, Bankruptcy Judge.

The State of Tennessee has sued the debtor Arch P. Pettit for a decree of non-dischargeability of his alleged indebtedness to it, in a yet unestablished amount, based upon the guaranty of the debtor Arch P. Pettit of a liability which has been enforced by a state court of Tennessee against the principal debtor, John P. Saad and Sons, Inc.

The parties to this action agreed to an expedited trial of this matter, whereupon it was tried to the court of bankruptcy on October 20, 1980, in Little Rock, Arkansas. The plaintiff appeared by William Barrick, Esquire, and Lea Breckinridge, assistant attorneys general. And the debtors appeared personally and by counsel, Isaac A. Scott, Esquire, and John Tisdale, Esquire. Based upon the admissible and probative evidence then adduced, the following findings of fact are made:

I

*Findings of Fact*

John P. Saad and Sons, Inc., in the year 1979, was conducting several of its operations within the State of Tennessee in a manner which the Attorney General of Tennessee deemed to be in violation of the water pollution laws of that State. It was asserted by the Attorney General that John P. Saad and Sons, Inc., was polluting and improperly disposing of waste materials on three separate sites—the "Trousdale Drive" site, the "Rutherford County" site, and the Smyrna Airport site, where it had leased a million gallon tank from the Nashville Airport Authority.

To enforce the water pollution laws of Tennessee, the Attorney General brought suit on March 22, 1979, against John P. Saad and Sons, Inc., in the Chancery Court of Davidson County, Tennessee. After a series of hearings, that court directed John P. Saad and Sons, Inc., to cease and discontinue its operations until it obtained a permit from the State to operate further and to cleanse the above sites of the pollution which had hitherto been committed.

John P. Saad and Sons, Inc., however, found it difficult to comply with the state court order, apparently because of its precarious financial condition. By October 1979, most of the deadlines established for the removal of the products of waste and pollution had not been met.

At this point, the debtor in these chapter 11 proceedings, Arch P. Pettit, came into focus as a potential investor in John P. Saad and Sons, Inc., who could possibly enable or ensure that company's compliance with the water pollution laws of the State of Tennessee. Thereafter, on November 6, 1979, a meeting took place among representatives of the Tennessee state government, John P. Saad and Sons, Inc., and the interested, potential investors, including Arch P. Pettit. The proposals of a Dr. Pearson of the Vanderbilt University were then presented as to methods of cleaning up the pollution, particularly with reference to the Smyrna tank. Although the representatives of the state government were skeptical about these methods, they were willing to have them attempted. A subsequent meeting was conducted on November 13, 1979, between officers of the State of Tennessee and Mr. Pettit, at which Pettit sought to ascertain from those officers a statement of the conditions under which Tennessee would drop its claims and charges and demands against John P. Saad and Sons, Inc. At this meeting, according

to the testimony of Ms. Breckinridge, Mr. Pettit "spoke of his financial ability" and "asked us to rely upon him." The state officers, therefore, requested that, in view of this assurance, as a precondition of their forebearing to enforce the state court order, Mr. Pettit obtain a majority interest in John P. Saad and Sons, Inc.; post a performance bond in the penal sum of $50,000; and pay certain individual citizens of the State of Tennessee approximately $8,000 for the pollution damage which had been caused by John P. Saad and Sons, Inc., to their drinking water. A written agreement was drafted, but was not filed with the state court at this time because of the demand of the Nashville Airport Authority for a $250,000 bond to ensure the cleanup of the Smyrna tank.[1] The agreement, however, was executed on behalf of Mr. Pettit by Robert C. "Jay" Marsh, his attorney in fact. And it contained a statement which was not true: that "Arch P. Pettit has acquired a majority interest in John P. Saad and Sons, Inc."

In explaining why he signed the agreement containing such a false statement, Mr. Marsh's testimony was to the effect that he did not focus on the statement and simply overlooked it.

Under the date of November 27, 1979, Mr. Pettit addressed the following letter to Mr. Barrick and Ms. Breckinridge and to counsel for the Nashville Airport Authority:

"Subsequent to our discussions regarding the settlement of your respective problems with John P. Saad & Sons, Inc., we have completed an initial preliminary analysis of Saad's immediate minimum cash requirements. We did this summary in order to respond to your requests for certain assurances of our ability and desire fully to perform Saad's obligations to you. While hopefully this analysis takes into account the majority of Saad's presently outstanding current (past due) accounts payable and minimum capital improvements necessary to resume operations of the Trousdale Facility, clearly additional amounts, not presently foreseeable or accurately estimateable, will be required.

"A detailed list of these cash requirements as currently identified is attached and can be summarized as follows:

Remainder of 1979 $100,982.45
First Quarter of 1980 54,473.64
TOTAL $154,455.64.

"As of November 27, 1979 we have already advanced $21,000.00 to Saad (exclusive of our own labor and travel expenses), such money being necessary to temporarily forestall foreclosure by the banks and to initiate improvements at the Trousdale Facility. (These expenditures are included in the $154,455.64.) We have no security for the repayment of this sum other than our confidence in our ability to return this business to a high production level.

"These cash estimates assume 1) Saad can begin full operation of the Trousdale facility no later than December 15, 1979 and thereby generate sufficient cash to meet his ongoing operational costs such as fuel, payroll, insurance, taxes, etc. (see schedule of December operations) and 2) a cost of treatment, removal and disposal of the Smyrna Tank contents plus cleaning the tank at a total of $14,000.00, perhaps a somewhat optimistic estimate. Additionally, these cash estimates include no monies for the repayment of interest bearing debt which as of October 21, 1979 totaled $166,335.00 or for contingent liabilities resulting from presently outstanding litigation other than those with the State of Tennessee.

"We have given the magnitude of the cash requirements presently identified and the exposure we face for additional cash requirements as yet unknown. We are reluctant to further compound our risk of substantial financial loss or further limit our financial flexibility to respond to these requirements as yet unknown by agreeing to pay the costs of performance bonds or letters of credit for

1. Ultimately, prior to the filing of the written agreement in the Chancery Court of Davidson County, Tennessee, the Nashville Airport Authority dispensed with this requirement.

the amounts of $50,000 (proposed settlement with the Attorney Generals' office) and $200,000.00 (proposed settlement with the Metropolitan Airport Authority). Quite frankly our preliminary discussion with potential sureties indicate Saad's present insolvency and our unwillingness as a matter of policy to pledge unrelated business assets in a rescue attempt of Saad make a performance bond or letter of credit prohibitively expensive.

"Additionally, under these circumstances we feel our minimum unsecured cash investment of $150,000.00 is more than sufficient incentive for us to fully comply with the other provisions of the presently proposed respective settlements, thereby making performance bonds redundant and unnecessary. We are willing to risk some $150,000 in saving Saad's business from bankruptcy in return for which we expect the reward of future profitability. The State of Tennessee receives a reward of a 'cleaned-up' operation at Trousdale and Smyrna as well as an exemplary business in full compliance with the spirit of the present environment regulations, and the Metropolitan Nashville Airport Authority receives the reward of deliverance from a potentially sizeable liability for the treatment, removal, and disposal of the Smyrna tank contents by virtue of our involvement. Neither loses anything it now has. If we fail to perform fully, you will at least have a business, the debts of which have been paid, to pursue. "With these considerations in mind we ask you to consider a redraft of our agreements excluding the performance bond requirements. Should these alternatives as contained in the attached revised agreements be unacceptable our present position, because of the magnitude of the financial risks already involved, would be to withdraw from further discussions with Saad in a purchase of his business. Frankly, we would anticipate an involuntary bankruptcy and the

necessity of negotiations with the Trustee. If acceptable, where such acceptance is forthcoming during the week of December 2, 1979, we propose to immediately go forward with the committments [sic] as contained in the revised agreements.

"We appreciate the flexibility and willingness you have shown in these matters to date and are optimistic that you will be willing to continue to share a portion of the burden in returning Saad to a going concern. In reaching your decision, Gary Blackburn can hopefully answer questions you might have as to further clarification of our position as well as the current status of Saad's business."

Whatever had been the tenor of the negotiations among the parties prior to January 22, 1980, however, the evidence clearly shows that, on that date, under the direction of Mr. Pettit's agent, "Jay" Marsh, or with his knowledge and acquiescence,[2] the agreement was filed with the Chancery Court of Davidson County, Tennessee. As noted above, it provided that (1) the debtor Arch P. Pettit

"agrees to guarantee the timely completion of all of the responsibilities of the Saads as set forth in this agreement, and in the event of the Saads' failure or inability to perform, will undertake and fully perform said responsibilities";

(2) the debtor Arch P. Pettit, within 10 days, should obtain a performance bond in the principal amount of $50,000 or else deposit the sum of $50,000 to be held by an escrow agent and "[i]n the event that the Saads and Arch P. Pettit fail to perform said obligations, these funds shall be applied toward the fulfillment of such obligations"; and (3) the debtor Arch P. Pettit should also "place the sum of Eight Thousand Dollars ($8,000) in an escrow account to be held by an agent selected by the parties for disbursement [to families using the wells in Rutherford County]."

---

**2.** The evidence before the court tends to show that the agreement was filed by one Gary Blackburn, who was acting as counsel for John P. Saad and Sons, Inc., with the full knowledge of "Jay" Marsh, although he denies in his testimony that he gave any specific instructions to Mr. Blackburn to file the agreement and proposed order in the Chancery Court.

There is no evidence of any compliance with any of these provisions and, as noted above, contrary to the representation in the agreement that "Arch P. Pettit has acquired a majority interest in John P. Saad & Sons, Inc.," Mr. Pettit had not acquired such a majority interest.

According to the testimony of Ms. Breckinridge, the plaintiff has some remedies still available in the state courts of Tennessee to compel John P. Saad and Sons, Inc., to abide the judgment of the Chancery Court of Davidson County.

## II

### Conclusions of Law

■ The general issue which has been submitted by the parties for decision is that of the dischargeability *vel non* of the defendant's liability to the plaintiff. That of the amount of liability has been reserved by the plaintiff for later determination. It is permissible to separate the trials of these issues. See *In re Mountjoy*, 368 F.Supp. 1087, 1096 (W.D.Mo.1973). Although it is generally preferable to have a consolidated trial of both issues, separation was permitted in this case because of the necessity for conducting the trial of the dischargeability issue on an expedited basis.

■ The species of nondischargeability which is sought to be proved in this action is that of liability for fraud within the meaning of § 523(a)(2) of the Bankruptcy Code. The elements necessary to be established have been described in *In re Taylor*, 514 F.2d 1370, 1373 (9th Cir. 1975), and, as material, include the making by the defendant of an intentional, material false representation which is known by him to be false. Further, as is also pointed out in the *Taylor* case, *supra*, it is required, in order for a decree of nondischargeability to issue, that a case of actual and positive fraud be proved, as opposed to fraud implied by law.

■ The evidence which has been adduced in the action at bar, however, does not demonstrate the falsity of any representation which was actually made by the defendant Arch P. Pettit himself. It has been intimated through the testimony adduced by plaintiff that Mr. Pettit's statements concerning his financial ability to ensure the clean-up operations commanded by the state court decree were false. But there is insufficient evidence to support this contention. There is no direct evidence of financial inability in the month of November 1979, when this representation is alleged to have been made. And the insolvency of the debtors as of the date of the filing of the petition for relief herein, some months later, does not, without more, prove retroactively any financial inability.[3]

It seems to have been, however, a contention of the plaintiff that Mr. Pettit undertook to ensure the total expense of the clean-up and thereby necessarily represented that he had vast financial resources which, if the representation were true, could not conceivably have been exhausted within the few succeeding months which intervened before the filing of the chapter 11 petition. The defendant Arch P. Pettit rejoins that the letter of November 27, 1979, demonstrates his intention to limit his liability to the sum of $50,000.[4] But there

---

3. "On principle, mere proof of insolvency at a subsequent date, not supplemented by connected findings, does not warrant a conclusion that such condition existed at an earlier date, and there is ample authority in support of this proposition. In particular, an adjudication in bankruptcy, standing alone, creates no presumption and warrants no inference that the debtor was insolvent for any period before the bankruptcy was filed . . ." 1A Collier on Bankruptcy para. 1.19, p. 130.6, 130.7 (1978). In this action, as in *Hicks v. Moore*, 261 F. 773 (5th Cir. 1919), there is insufficient evidence to indicate that the financial inability did not occur between the crucial dates in November 1979 and the date of the order for relief herein.

4. Nevertheless, as noted above in the text of this memorandum, Mr. Pettit undertook in the agreement filed in the Chancery Court of Davidson County, Tennessee to guarantee "completion of all of the responsibilities of the Saads" even as he agreed to post a $50,000 performance bond and pay $8,000 for the owners of the polluted wells. In this proceeding, however, the court need not resolve any ambiguity in this regard in view of the plaintiff's express reservation of the determination of liability to a later proceeding.

is no evidence of the degree of the debtor's ability or inability at the time the representation is alleged to have been made. And, on this issue, the plaintiff bears the burden of proof, both in the sense of the burden of persuasion and the risk of nonproduction of evidence. *In re Taylor, supra.*

The representation which is demonstrably false is that which Mr. Marsh made as Mr. Pettit's attorney in fact in the agreement executed in November 1979 and then filed in January 1980 to provide the basis of the decree of the Chancery Court of Davidson County, Tennessee. This was, as noted above, to the effect that Mr. Pettit had already obtained a majority interest in John P. Saad and Sons, Inc., when the evidence demonstrates this not to be true. The law of bankruptcy relating to the nondischargeability of liabilities created by fraud has long recognized that a debtor is to be held responsible for the misrepresentations of his authorized agent.[5] In this case, the facts found above fully establish the authority of Marsh to make the representation, as well as the falsity of the representation.[6] But the principles governing the principal's responsibility for the misrepresentation of his authorized agent do not and cannot eradicate the requirement that, to constitute a ground for nondischargeability, the misrepresentation must be intentional. As noted above, Mr. Marsh's uncontradicted explanation for signing the statement containing the misrepresentation is to the effect that it was an unintentional oversight. This explanation is credible when there is no evidence of close communication between Mr. Pettit and Mr. Marsh through this period of time which would have availed the latter of the reason for focusing upon the statement and to recognize its falsity. Rather, it appears from the evidence that Mr. Pettit simply delegated these matters to Marsh who, in turn, made an honest mistake in this regard.[7]

Further, it does not appear that the misrepresentation was in fact a material one. The obvious purpose of the officers of the State of Tennessee in requesting that the representation be made was to be assured of the financial backing of the investment in the company which would have been made by Mr. Pettit when it came to defraying the costs of the clean-up operations. But this was also provided by means of an explicit undertaking, as noted above, by Mr. Pettit to guarantee the funds necessary to the clean-up, at least to some limited amount.[8] It is the latter provision of the agreement which must prevail under the standard rubric of construction that the specific controls over the general. It is therefore the latter provision which Tennessee must be deemed to have relied upon as assurance of the financial ability to perform the task.[9] The representation concerning "majority interest" therefore appears not to have been material.

For the foregoing reasons, it must be concluded that the defendant's liability to the plaintiff, whatever its magnitude, is dischargeable. But the liability and the responsibility to finance the necessary clean-up operations may be made the basis of a claim against the debtor in these chapter 11 proceedings. Accordingly, the debtor must somehow classify it and provide for its payment or impairment after the amount is established by a hearing, stipulation, or other appropriate method in later proceedings.

5. "A bankrupt who has made no false representation himself may nevertheless be bound by the fraud of an agent acting within the scope of his authority." 1A Collier on Bankruptcy para. 17.16, p. 1641 (1976). The evidence in this case shows that, for the period ending March 31, 1980, through a written appointment of Mr. Marsh as his attorney in fact dated November 16, 1979, Mr. Pettit made Mr. Marsh his agent with virtually plenary powers. See plaintiff's exhibit 3 herein.

6. See note 5, *supra.*

7. See note 5, *supra.*

8. See note 4, *supra.*

9. In fact, it would seem that this provision would be more readily relied upon than the "investment" or "majority interest" provision. Once the finances were placed into the Saad's business, it does not seem likely that they would then be available for the clean-up operations.

From the evidence which has been presented to the court, it appears that that amount figures to be diminished by as much as the State of Tennessee can obtain from the Saad concern in the course of exhausting its state court remedies against that concern. For the liability of the debtor in this regard is a contingent one.

It is therefore, for the foregoing reasons,

ORDERED, ADJUDGED, AND DECREED that the defendant's indebtedness to plaintiff be, and it is hereby, declared to be dischargeable in bankruptcy.