**In re Rose E. BELEAU, Debtor.**

**Anthony C. GIESINGER and Precilla R. Giesinger, Plaintiffs,**

**v.**

**Rose E. BELEAU, Defendant.**

**Bankruptcy No. 8100270.**
**Adv. No. 810174.**

United States Bankruptcy Court,
D. Rhode Island.

Nov. 30, 1983.

Thomas A. Lynch, Providence, R.I., for plaintiffs.

Stephen J. Brunero, West Warwick, R.I., for defendant.

## DECISION DETERMINING DEBT TO BE NONDISCHARGEABLE

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on July 28, 1983 on the complaint of Anthony and Precilla Giesinger to have a debt[1] to them declared nondischargeable. The following relevant facts were adduced at the hearing:[2] In August 1980 the Giesingers contacted Yorktown Associates, a realty firm, because they were interested in buying a house.[3] At the Yorktown office they met the defendant, Rose Beleau,[4] a real estate salesperson, who showed them a house located at 68 Lonsdale Street in West Warwick, which she owned personally. The Giesingers liked Beleau's house and placed a $100 deposit on the property. (Exhibit A.) They also signed a document entitled "Sales Agreement and Deposit Receipt", which Beleau also signed as "Seller". (Exhibit B.) Significantly, it does not appear that the Giesingers were shown any other property listed with Yorktown Associates for sale. The testimony concerning subsequent events is conflicting.

Anthony Giesinger testified that Beleau told him and his wife that based on their income and financial condition they would not be able to obtain bank financing and that, therefore, she would hold the mortgage on the property for them. On that advice, the Giesingers did not apply for a bank loan. Whether they would have been refused a conventional mortgage has not been shown, but their payment of the deposit, the required down-payment, and the regular monthly payments to date, indicates quite the contrary. According to Anthony Giesinger, whose testimony is generally accepted, on the day of the closing Beleau informed him that "due to a change in plans" the closing would be at the office of her personal attorney, instead of at the office of Yorktown's attorney, Joseph Vitullo. At the closing the parties signed a document entitled "Land Purchase and Sale Contract". (Exhibit C.) Giesinger testified that when he questioned Beleau's attorney about the wording of the document, he was assured that although it sounded like a rental agreement, the Giesingers were in fact purchasing the property. That language, counsel explained, was necessary in this type of legal document. At this meeting the Giesingers issued a check in the amount of $3,000 (the balance of the deposit) to Beleau, and a $100 check to Beleau's attorney for his services. (Exhibit A.) The Giesingers moved into the house in October. On October 31, Beleau collected a payment of $402.37 and furnished the Giesingers with an amortization table itemizing payments over thirty years, representing principal, interest, taxes and insurance. (Exhibit G.) At this time, according to the Giesingers, they believed that they owned the house and were making mortgage payments to Beleau.[5] On November 9, 1980, the Giesingers were contacted by Cheryl Crotchett, a representative of one Diane Stukus, who informed the Giesingers that Stukus owned the house and that henceforth Stukus expected "the rent" to be paid to her. At Stukus' request, the Giesingers met Beleau at Attorney Joseph Vitullo's office, on November 10, at which time Beleau executed a quitclaim deed to Stukus. Giesinger testified that he did not understand what was going on, but was told that Stukus now owned the property and was charging rent of $275.00 per month. At this point the Giesingers asked Beleau to return their deposit and first mortgage payment. Beleau told them she no longer had the money.

---

1. *See* Claim # 4 for $4000 on the debtor's Schedule A–3 List of Unsecured Creditors.

2. This opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 7052.

3. At no time have the Giesingers been described, even by the debtor, as "rental" clients.

4. Rose Beleau filed a Chapter 7 petition on April 6, 1981.

5. Based on the evidence, I conclude that this assumption was reasonable.

The defendant's version of the facts is as follows: Beleau owned the property in question, subject to a $27,000 mortgage held by Diane Stukus.[6] After she received the Giesingers' $1000 deposit, Beleau was informed by Stukus that she (Stukus) refused to do business with the Giesingers as mortgagors. Beleau claims that she explained this to the Giesingers, along with the fact that at the closing a land sales contract would be executed whereby the Giesingers would pay Beleau, who would hold title to the property until her (Beleau's) 30 year mortgage to Stukus was paid. This contention is rejected. The Giesingers were looking to buy a house, and I do not believe, as defendant contends, that they knowingly agreed to purchase a house on "layaway" over 30 years.

Within one month after the transaction with the Giesingers in October, 1980, Beleau defaulted on her mortgage payments to Stukus, who in turn threatened foreclosure. At that time Beleau owed $27,000 on her mortgage with Stukus and she believed the value of the property to be approximately $35,000. Without consulting the Giesingers or allowing them the opportunity to obtain other financing, Beleau executed a quitclaim deed to Stukus. The Giesingers were then left with only the option to work out a suitable rental agreement with Stukus.

The issue is whether the $4400 paid by the Giesingers to Beleau should be declared nondischargeable, as property obtained through misrepresentation and/or fraud. 11 U.S.C. § 523(a)(2)(A). Based on a thorough review of the record, including the financial condition of the defendant at the time of the events in question, and particularly the demeanor of the witnesses, we conclude that the $4400 in question is nondischargeable. Section 523(a)(2)(A) of the Bankruptcy Code provides:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . . .

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . .

Under this section, the creditor must establish by clear and convincing evidence that:

there ... exist(s) a false representation by the debtor which is known to be false and which was made with the intent to deceive the creditor. Further, the creditor must have reasonably relied upon the false representation and sustained a loss as a result. (citations omitted.)

*Raimi v. Kalinowski (In re Kalinowski)*, 27 B.R. 114, 116 (Bkrtcy.M.D.Fla.1983). *See also Brant v. Zangrilli (In re Zangrilli)*, 1 B.R. 717 (Bkrtcy.D.R.I.1979); 3 Collier on Bankruptcy ¶ 523.08 (15th ed. 1983).

### (1) FALSE REPRESENTATION

To prevail here, the Giesingers must establish that Beleau knowingly made a false representation. The first document signed by the parties is a "Sales Agreement and Deposit Receipt" and promises to convey a "good and sufficient warranty deed." Beleau signed on the line indicating "seller", and added the somewhat confusing language "subject to land sale $4,000 down at closing $30,000 mortgage for 12½% for no more than 30 years."

 Giesinger admitted that after reading that document at the closing, he was confused and stated that it sounded to him more like a rental agreement than a deed. He further testified, however, and I find as a fact, that Beleau's counsel[7] as-

---

**6.** This disclosure was not made to the Giesingers until sometime after November 10, 1980 when the quitclaim deed was executed and the Giesingers were told to begin paying rent.

**7.** Beleau's counsel did not testify at the hearing. Pursuant to DR5–101 of the Code of Professional Responsibility as adopted in Rhode Island by Rule 47 of the Supreme Court Rules, an attorney must withdraw as counsel in a case in which he is a witness, and we are mindful that it is this rule which may have influenced counsel not to testify in this matter.

sured him that the agreement had to be drafted with the language in question, but that the Giesingers were in fact buying the property. Giesinger stated that on the date of the closing he was told that the house was his. For purposes of nondischargeability of a debt under 11 U.S.C. § 523(a)(2)(A), a debtor is held to be responsible for the misrepresentations of his agent. *Tennessee v. Pettit (In re Pettit),* 17 B.R. 6 (Bkrtcy.E.D.Ark.1980) (debtor responsible for misrepresentations made by his attorney); 3 Collier on Bankruptcy ¶ 523.08 (15th ed. 1983). In this case, Beleau's attorney was at all times acting on her behalf, and his representations are imputable to the defendant under § 523(a)(2)(A).

Additionally, Beleau provided the Giesingers with a computer printout which itemized payments due over thirty years. (Exhibit G.) That document lists $30,000 as "Loan Amt." There is no credible showing that Beleau ever informed the Giesingers that the scheduled payments were not in fact mortgage payments. Based on the entire record, we conclude that Beleau herself and through her attorney, made material misrepresentations to the plaintiffs to the effect that the transaction in August, 1980 would result in the transfer of title to the property in question.

### (2) INTENT

■ The misrepresentation must have been made intentionally in order for the debt to be held nondischargeable. The intent to deceive is a fact question which may be inferred from the evidence. *Cuneo v. Smith (In re Smith),* 25 B.R. 396 (Bkrtcy.D.Md.1982). We conclude that Beleau and her counsel intended to make the representations discussed above to the Giesingers. For her part Beleau attempted to portray a lack of understanding regarding the significance of the legal documents in question. She alleged that the switch from the sales agreement to the installment sale contract was, in her mind, merely a road towards "creative financing." The court finds this

argument untenable. Prior to events in question, Beleau was a licensed real estate broker,[8] and had worked at Yorktown for 2 to 3 years. *See Plummer v. Gillespie (In re Gillespie),* 11 B.R. 167 (Bkrtcy.D.Or.1981) (debt nondischargeable where debtor was experienced in financial transactions). Beleau testified that land sales agreements and installment sales contracts were used by her real estate firm and that they were included as study areas for the real estate licensing examination. In light of her real estate training and experience, the Court finds that Beleau knew that the installment contract was merely a conditional promise to sell at some future time. Yet, she misled the Giesingers to expect an outright sale of property to them.

Beleau asserts that she never actually promised the Giesingers a deed or title to the property. The evidence indicates quite the contrary. The words in her own handwriting on the sales agreement state "warranty" deed and "30,000 mortgage." (Exhibit B.) The payment schedule given by Beleau to the Giesingers states "Loan Amt" as $30,000. (Exhibit G.) Beleau told the Giesingers that they would be unable to obtain bank financing, but there is no evidence of her having consulted with any bank, and she urged the Giesingers to place a deposit immediately, "because others were interested in the property." Beleau also conceded on cross examination that she was in financial difficulty at the time, and the schedules show Beleau with over $28,000 in unsecured debt, and less than $1300 in assets.

The entire scenario suggests that Beleau needed a quick cash fix because of her own financial problems. When Stukus refused to release Beleau on the mortgage and to permit the Giesingers to assume the note, the entire transaction had to be recast, in order not to lose the funds that had already been advanced by the Giesingers. So Beleau switched to the installment land sale contract in order to keep the transaction

---

**8.** The record does not indicate whether Beleau still had her broker's license as of August 1980, but such fact is immaterial to our conclusion that Beleau was knowledgeable about the field of real estate.

alive, but without informing the Giesingers. At that point Beleau knew that she did not intend to transfer title to the property to the Giesingers. This court finds that Beleau's failure to inform the Giesingers of the altered nature of the transaction was a willful omission of a material fact.

### (3) REASONABLE RELIANCE

The Giesingers have sustained their burden of showing that they reasonably relied on Beleau's misrepresentations. Both of the Giesingers are able to read fluently, and spent 10 to 15 minutes to read the Land Purchase and Sale Contract. Nevertheless, we find their reliance on the statements and/or actions by Beleau and counsel, which led them to believe that they were buying a house, to be reasonable. Anthony Giesinger was 24 years old at the time in question and neither he nor his wife had ever purchased real property before. Although the Giesingers appear to be intelligent people, neither is particularly sophisticated in business affairs. *See Davis Co. v. Medow (In re Medow)*, 26 B.R. 305 (Bkrtcy. S.D.Fla.1982) (court may look to creditor's sophistication in determining reasonableness of reliance). I accept as reasonable Anthony Giesinger's expectation that, after making the down payment and signing the papers, he would own the house. Beleau's counsel assured Giesinger that he was, in fact, buying the property. Beleau contends, however, that despite such assurance, Giesinger knew he would have no ownership interest in his "purchase" until 30 years of payments were made. This stretches the idea of reasonableness beyond limits. The plausible understanding is Anthony Giesinger's, i.e., that this was a transfer of title with a mortgage payable over 30 years. His reliance on Beleau's attorney (and resulting failure to engage his own counsel) was reasonable, in light of the fact that in paying a $100 attorney fee, he expected to receive advice intended to protect his interest. Additionally, I find it reasonable for a person not familiar with real estate contracts to assume that he owns a house on which he has paid $4,000 down and received a payment schedule for a $30,000 "loan."

### (4) LOSS TO THE PLAINTIFF

 It is clear that the Giesingers have sustained a loss. They paid what they believed to be a $4,000 down payment and a $400 mortgage payment on property which they later discovered they did not purchase. The Giesingers did, however, receive some benefit from the rental value of the house which they occupied for a period of one month while Beleau still owned it. Therefore their claim should be reduced by $275.00 to reflect in quantum meruit theory the market rental value of the property which inured to the benefit of the Giesingers, as aforesaid.

Based upon the foregoing discussion, findings and conclusions, the $4,400 claim of the Giesingers is determined to be nondischargeable under § 523(a)(2)(A) in the amount of $4,125.

Enter Judgment accordingly.