**In re Edward Alan LeMIRE, Debtor.**

**Paul J. SZILAGYI, Plaintiff,**

**v.**

**Edward Alan LeMIRE, Defendant.**

**Bankruptcy No. 8300094.**
**Adv. No. 830137.**

United States Bankruptcy Court,
D. Rhode Island.

June 19, 1984.

842

Clinton L. Poole, Providence, R.I., for plaintiff.

Samuel L. DiSano, Barrington, R.I., for debtor.

## DECISION

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Plaintiff Dr. Paul J. Szilagyi has filed a complaint to determine the dischargeability of two alleged debts, pursuant to 11 U.S.C. § 523(a). In Count I, Szilagyi alleges that Edward Lemire, the debtor, willfully and maliciously converted the plaintiff's personal property in the amount of $12,000,[1] and asks that this debt be held nondischargeable pursuant to 11 U.S.C. § 523(a)(6). In Count II,[2] Dr. Szilagyi alleges that the debtor fraudulently induced him to sign a promissory note and a personal guaranty, both in the amount of $25,000. The plaintiff asserts that the debtor should indemni-

fy him for any claim brought by the holder of the note and guaranty, and that this indemnification should be held nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

## FACTUAL BACKGROUND [3]

Rubicon International, Ltd., a Rhode Island corporation, was founded in January 1980 by Edward Lemire, George LeMire,[4] and others not relevant to this proceeding. The company was formed to operate as a consulting firm to service the jewelry and precious metals industry. In May or June of 1981, when Edward Lemire and George LeMire were the only remaining principals of Rubicon, Dr. Szilagyi, an organic chemist, was hired as technical director. In the fall of 1981 "Rubicon Analytical and Assay Laboratories" was incorporated as an independent analytical laboratory, but a division of Rubicon International.

It is undisputed that Dr. Szilagyi wished to become a shareholder in Rubicon International, and several drafts of contracts to accomplish that end were prepared, but none was ever executed. Although Dr. Szilagyi used the title "Senior Vice President", and was involved to some degree in the day to day affairs of the business, his status in the corporation was different from that of the two principals. For example, while George LeMire and Edward Lemire were drawing only enough for subsistence, Szilagyi was being paid $1000 per week from the time he joined Rubicon International in mid-1981 until the end of that year. The corporation was then in poor financial shape and unable to continue paying him, and he left to spend several weeks in Florida.

In January 1982, while Szilagyi was still in Florida, Rubicon Analytical and Assay Laboratories moved from Warwick to 147

---

1. Count I avers that plaintiff's personal property in the amount of $170,000 was converted by the debtor. The plaintiff's attorney stipulated at a pre-trial conference, however, that the amount now at issue is $12,000.

2. Although the plaintiff's complaint includes a third count, he has elected not to pursue the allegations contained therein.

3. This opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 7052.

4. Edward Lemire and George LeMire (brothers) spell their surnames differently.

South Street, Providence. After Dr. Szilagyi's return from Florida, he worked at the South Street location, where Rubicon Research Laboratories also began operating. Although Dr. Szilagyi contends that the Research Laboratory was his own business, the debtor contends that the Assay Laboratory and the Research Laboratory were one and the same. In any event, it is undisputed that the two laboratories were located at the same address, and in the same room.

From the beginning of Dr. Szilagyi's association with Rubicon International, that corporation was in financial difficulty. In October 1981 the company arranged to borrow $25,000 to set up the Assay Laboratory. Although Edward Lemire testified that the loan was also needed and intended to keep Rubicon International in business, Dr. Szilagyi asserted that he would not have agreed to be a co-signer and personal guarantor of the note if he had not been assured that the funds would be used solely to equip the assay laboratory. Dr. Szilagyi, Edward Lemire, and George LeMire each signed the note (Plaintiff's Exhibit 19) and the personal guaranty (Plaintiff's Exhibit 20). These funds were exhausted within two months, and an assay laboratory had not yet been equipped. Rubicon International then obtained a loan in the amount of $19,000 from People's Bank in March 1982, and personal guaranties again were executed by Dr. Szilagyi, Edward Lemire, and George LeMire. In addition, Rubicon gave as collateral "all equipment now owned or hereafter acquired.... The collateral is located at 147 South Street, Providence, Rhode Island." (Defendant's Exhibit 19—UCC–1 statement.)

By the fall of 1982 relations between the parties had really deteriorated, and Rubicon International was in dire financial straits. In September 1982 Dr. Szilagyi incorporated his own company, Aquonics Research Laboratories, and began operating it at the South Street address. Edward Lemire, stating that he "felt betrayed" by Szilagyi's incorporation and operation of Aquonics, and asserting that his attorney advised him to secure the premises, placed chain locks on the doors of the South Street laboratories; Dr. Szilagyi then had the locks changed. Lemire then arranged to have virtually all the equipment owned by the several companies placed in storage. On October 27, 1982, George LeMire, as President of Rubicon International, and Edward Lemire, as Vice President, sent Dr. Szilagyi a letter terminating his employment "as Rubicon's Senior Vice President & Technical Director over Rubicon Analytical & Assay Laboratories and Rubicon Research Laboratory." (Defendant's Exhibit 42.) Soon thereafter, Rubicon International was placed into receivership, and on February 8, 1983, Edward Lemire filed his Chapter 7 petition with this Court.

## COUNT I

In Count I of his complaint Dr. Szilagyi alleges that the debtor, Edward Lemire, willfully and maliciously converted his personal property, and asks that a debt in the amount of $12,000 be determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(6). This section provides as follows:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

.     .     .     .     .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

It is clear from the legislative history that this provision contemplates "a willful and malicious conversion." 124 Cong.Rec. H11,095–96 (daily ed. Sept. 28, 1978); S17,-412–13 (daily ed. Oct. 6, 1978), *cited in* 3 Collier on Bankruptcy ¶ 523.16[3] (15th ed. 1984). It is also clear that "a technical conversion may very well lack any element of willfulness or maliciousness necessary to except the liability from discharge." 3 Collier on Bankruptcy at ¶ 523.16[1] (citations omitted). Furthermore, to be nondischargeable as a "willful and malicious injury," the conversion of another's property must be "without his knowledge or con-

sent, done intentionally and without justification or excuse, to the other's injury." *Id.*

■ Based on all the evidence, the Court finds that the plaintiff has failed to meet his burden of proof that the debtor willfully and maliciously converted his personal property. The Court makes the following findings and conclusions with respect to Count I:

1. On the advice of his attorney and the FBI, Edward Lemire attached chain locks to the doors of the South Street laboratories because he wanted to ensure that no items of disputed ownership were removed from the premises.

2. After Dr. Szilagyi changed the new locks, Edward Lemire arranged to have the equipment in the laboratories placed in storage; some persons were able to recover property which indisputably belonged to them, and the remaining property was ultimately placed in the control of the state court receiver. No credible testimony was presented which indicated that the debtor personally took possession of any property that Dr. Szilagyi alleges was his own personal property.

3. There is considerable confusion about the ownership of property in Rubicon Research Laboratories. Dr. Szilagyi testified that he personally bought equipment for the laboratory, and that he also brought with him from Connecticut some equipment that was used in Rubicon Research Laboratories. Szilagyi admitted that he did not tell the truth to the debtor or to George LeMire about the source of certain California funds, and stated that said funds were received in several mailings, each containing $5,000. There is no reason to disbelieve Edward Lemire's testimony that he authorized the deposit of these funds into the Rubicon Research Laboratories checking account.

There is additional evidence to support the debtor's contention that the Research and the Assay Laboratories were both considered divisions of Rubicon International, and that, at a minimum, Edward Lemire would have good reason to be uncertain about the ownership of various items of equipment and chemicals: (a) The Research Laboratories and the Assay Laboratories were located in the same room. (b) The parties stipulate that during the times in question all chemicals and equipment were purchased through Rubicon International's central office in Warwick. (c) Some of the invoices refer to "Rubicon Assay & Research Lab" (*e.g.,* Plaintiff's Exhibit 3). (d) Dr. Szilagyi sent a memorandum to some employees stating that "Rubicon Laboratories (Assay & R & D) is on South Street" (Defendant's Exhibit 37). (e) The rent on the South Street premises was paid by at least two divisions of Rubicon.[5]

Based on these findings and conclusions, whatever personal property may not have been recovered by Dr. Szilagyi[6] was not willfully and maliciously converted by Edward Lemire. The plaintiff has failed to demonstrate that Edward Lemire acted in an unreasonable manner in his handling of property at 147 South Street which belonged to Dr. Szilagyi. The plaintiff clearly has not demonstrated that Edward Lemire willfully and/or maliciously converted any property belonging to Dr. Szilagyi.

---

5. Edward Lemire testified that rent on the South Street premises was paid variously by Rubicon International, Rubicon Assay Laboratories, and Rubicon Research Laboratories for the period from April to November 1982. It is undisputed that rent for November 1982 was paid by a check drawn on Rubicon International's account and signed by Edward Lemire and George LeMire. (Debtor's Exhibit 38.) Dr. Szilagyi testified that because neither Rubicon International nor the Assay Laboratories had sufficient funds, he used his funds in the Rubicon Research account to pay the rent for the period from April through October, and he submitted checks drawn on the Rubicon Research account (Plaintiff's Exhibits 11–15) as receipts for rent paid for the months of May through September 1982. The testimony of both parties lends support to Edward Lemire's assertion that funds from the three accounts were not carefully segregated, and that to some extent each division of Rubicon financially assisted the other divisions.

6. Edward Lemire testified that Dr. Szilagyi recovered all his personal property, and Dr. Szilagyi concedes that he recovered a "large percentage" of his equipment.

## COUNT II

■ In the second count of his complaint, the plaintiff alleges that the debtor deceived and fraudulently induced him to sign a promissory note, and a guaranty for said note, in the amount of $25,000. Although it is not clear from the complaint, the plaintiff's post-trial memorandum makes explicit that the plaintiff is proceeding under § 523(a)(4) of the Bankruptcy Code. This section provides that a debtor is not discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

In late October 1981, Paul Szilagyi, Edward Lemire, and George LeMire executed a "promissory note" (Plaintiff's Exhibit 19) and a "personal guaranty" (Plaintiff's Exhibit 20) in order to obtain a $25,000 loan from Anita DelBonis to Rubicon International. Dr. Szilagyi asserts that he would not have agreed to sign the note or guaranty[7] were it not for the debtor's assurance that the funds would be used solely to equip a new assay laboratory. A more accurate description of the facts, however, appears in the plaintiff's brief: "Dr. Szilagyi had executed the note *under the impression* that the funds were to be used for Rubicon Assay Laboratories." Plaintiff's Memorandum at 5 (emphasis added). That Dr. Szilagyi was "under the impression" that the funds would be so used is hardly in dispute. What the plaintiff must prove, though, is that the debtor, in a fiduciary capacity, made "false and misleading representations and promises" to Dr. Szilagyi, and "misrepresented to the Plaintiff the proposed use of the proceeds of the $25,-000.00 note." Joint Pre-Trial Order, §§ 1(d), 1(e).

There is some question whether the relationship between the debtor and the plaintiff is a fiduciary one. A fiduciary is defined as

[a] person or institution who manages money or property for another and who must exercise a standard of care in such management activity imposed by law or contract; *e.g.* executor of estate; receiver in bankruptcy; trustee.

Black's Law Dictionary 563 (5th ed. 1979). Although Edward Lemire was an officer in Rubicon International, "a corporate officer owes a fiduciary duty to the corporation"[8] rather than to an individual employee. As a general rule,

section 523(a)(4), insofar as it relates to a debtor acting in a fiduciary capacity, does not apply to the frauds of ... partners, and other persons similarly situated. Also, the commonplace frauds of the ordinary debtor in disposing of his property so as to hinder, delay, or defraud his creditors are not within clause (4).

3 Collier on Bankruptcy ¶ 523.14[c] (15th ed. 1984) (citations omitted). Furthermore, "the fiduciary relationship must have existed previous to or independent of the particular transaction from which the debt arises." *Id.* (citation omitted).

Dr. Szilagyi was active in several areas of management of Rubicon International. He had an informal working agreement with Edward Lemire and George LeMire, although no agreement was executed that would have given Dr. Szilagyi the equity position that he sought in the business. Although the Court rejects the debtor's contention that Dr. Szilagyi "was at all times a full partner in Rubicon International," Debtor's Memorandum at 16, the Court does find that the relationship between Edward Lemire and Dr. Szilagyi was not a fiduciary one that "existed previous to or independent of the particular transaction" at issue—the inducement for Dr. Szilagyi's signing the note and personal guaranty. 3 Collier at ¶ 523.14[c].

Even assuming, but solely for the sake of discussion, that the debtor was acting in a fiduciary capacity, Dr. Szilagyi has failed to establish that the debtor made any fraudulent misrepresentations upon which

---

7. The Court finds credible Edward Lemire's testimony that the DelBonises would not have made the loan in the absence of personal guaranties.

8. *Bombardier Corp. v. Penning (In re Penning),* 22 B.R. 616, 619 (Bankr.E.D.Mich.1982).

he relied. The testimony is conflicting, and the Court is unable to assign more credibility to Dr. Szilagyi's contention that the debtor had promised that the proceeds of the loan would be used solely for an assay laboratory, than to the debtor's testimony that he was seeking a loan for various corporate obligations. The plaintiff concedes that "[t]he proceeds of the note ... were used for general corporate obligations," Plaintiff's Memorandum at 5, and the debtor's testimony that approximately $7,000 of the proceeds were used to pay Dr. Szilagyi's salary, remains uncontradicted. There is no suggestion that the debtor misappropriated any of these funds for his personal benefit.

Based upon all the evidence, the Court concludes that the plaintiff has failed to meet his burden of proof that the debtor engaged in "fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4).

In Count II of his complaint, but not in the post-trial memorandum, the plaintiff alleges that the debtor "willfully and maliciously deceive[d]" Dr. Szilagyi with his promises, and that the plaintiff was "induced by fraud" to sign the note. No mention is made in the complaint of a fiduciary relationship, and it would appear from the complaint (filed by an attorney different from the one who represented Dr. Szilagyi at trial) that the plaintiff was proceeding on this Count under § 523(a)(2)(A) and (a)(6).

Section 523(a)(6) excepts from discharge debts incurred "for willful and malicious injury by the debtor to another entity or to the property of another entity." "Under this paragraph, 'willful' means deliberate or intentional." H.R.Rep. No. 595, 95th Cong., 1st Sess. 365 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 79 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5865, 6320. Even if the debtor had made the promises alleged by Dr. Szilagyi (and we find that he did not), there is no evidence of "deliberate or intentional" or malicious injury to the plaintiff. Thus, the plaintiff cannot prevail under § 523(a)(6).

Section 523(a)(2)(A) provides:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

.    .    .    .    .

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition....

Although there are variations among bankruptcy courts concerning the facts that a creditor must establish to prevail under this Section, we think the criteria are effectively summarized in a recent decision:

The five elements required to prove that an obligation is non-dischargeable under Section 523(a)(2)(A) are as follows:

1. that the debtor made a representation;

2. that the debtor knew the representation was false when he made it;

3. that the debtor made the representation with intent to deceive the creditor;

4. that the creditor relied on the representation; and

5. that the creditor sustained damage as a proximate result of the false representation.

*U.S. Life Title Insurance Co. of New York v. Wade (In re Wade)*, 26 B.R. 477, 483 (Bankr.N.D.Ill.1983) (citations omitted). *See also Giesinger v. Beleau (In re Beleau)*, 35 B.R. 259, 261 (Bankr.D.R.I.1983); *Sbardella v. Proia (In re Proia)*, 29 B.R. 713, 715 (Bankr.D.R.I.1983).

The plaintiff has failed to establish even the first element—that the debtor made the alleged representations regarding the use of the proceeds of the loan—we therefore need not consider the remaining ones. Accordingly, the plaintiff cannot prevail under § 523(a)(2)(A).

Having failed to meet his burden of proof with respect to the allegations in Count II, the plaintiff's complaint for judgment against the debtor in the amount of $25,000, and for indemnification of any claims brought against the plaintiff by Anita DelBonis, is denied.

## CONCLUSION

The plaintiff has failed to meet his burden of proof with respect to both Count I and Count II. Edward Lemire's alleged debts to Dr. Paul Szilagyi are determined to be discharged, and Dr. Szilagyi's complaint for judgment in each Count is denied.

Enter judgment accordingly.