In re Hiram S. GANS, Debtor.

Elizabeth SCHWALBE and Dorothy Miller, as Administrators of the Estate of Erika Marlowe, Plaintiffs,

v.

Hiram S. GANS, Defendant.

Bankruptcy No. 85–30208.
Adv. No. 85–7040.

United States Bankruptcy Court,
S.D. New York.

June 15, 1987.

476

Hall, Dickler, Lawler, Kent & Friedman, White Plains, N.Y., for plaintiffs; David L. Goldrich, of counsel.

Hiram S. Gans, Tuxedo Park, N.Y., pro se.

## DECISION ON EXCEPTION TO DISCHARGEABILITY OF DEBT PURSUANT TO CODE SECTIONS 523(a)(2)(A) & 523(a)(4)

JEREMIAH E. BERK, Bankruptcy Judge.

This is an adversary proceeding pursuant to Sections 523(a)(2)(A) and 523(a)(4) of the Bankruptcy Code ("Code") commenced by Elizabeth Schwalbe and Dorothy Miller ("plaintiffs") as administrators of the estate of Erika Marlowe ("Marlowe") against Hiram S. Gans ("defendant" or "debtor" or "Gans").

A former attorney at law, Gans filed his Chapter 7 petition for relief on May 10, 1985. On August 12, 1985, the plaintiffs filed the instant dischargeability complaint seeking a determination that the amount of $123,000.00, plus interest and costs, is nondischargeable. After several extensive delays during which time the defendant

sought, though unsuccessfully, to secure counsel to represent him in this adversary proceeding, a two-day trial was held. At the conclusion of plaintiffs' case, the defendant made a motion to dismiss the complaint for failure to prove a *prima facie* case and the court reserved decision. After a protracted post-trial briefing schedule, the proceeding was fully submitted on April 14, 1987.

The gravamen of the complaint concerns a series of financial transactions that took place more than a decade ago between Marlowe and Gans from 1975 through 1977. Marlowe died subsequent to these transactions, but prior to trial. At trial plaintiffs offered no direct testimony concerning Marlowe's role in these transactions, other than the testimony of Gans himself. The only witnesses appearing for defendant were Gans and plaintiffs' attorney. From the testimony and evidence thus adduced, the pertinent facts are found.

## FINDINGS OF FACT

The defendant was first admitted to practice law in New York in 1929. Plaintiffs' Exhibit 3 at 4. He maintained offices for his law practice in New York City at least until the 1970's when, due to financial difficulties, he removed his practice to his home at Tuxedo Park, New York. *Id.* at 34–35.

Gans became acquainted with Marlowe during 1928 and 1929 when Marlowe worked for Gans and his wife as a maid. Tr. at 33–34 (Apr. 23, 1986); Plaintiffs' Exhibit 3 at 6. After approximately one year in defendant's employ, she left to seek another position. Over the years, however, Marlowe maintained a social, though apparently infrequent, relationship with Gans and his wife. Plaintiffs' Exhibit 3 at 6–7.

In 1974, Marlowe became aware of a bequest in the amount of $175,000.00 that she expected to receive from the estate of a benefactor who had provided her with support during his lifetime. Tr. at 34 (Apr. 23, 1986); Plaintiff's Exhibit 3 at 13–14. To represent her in the probate proceeding, Marlowe retained Gans that same year.

This marked the first and apparently only time that Gans represented Marlowe in a professional capacity. Tr. at 34 (Apr. 23, 1986); Plaintiffs' Exhibit 3 at 5–7. Marlowe paid Gans $1,750.00 for his services in this regard. Tr. at 35 (Apr. 23, 1986); Plaintiffs' Exhibit 3 at 35.

Gans served as Marlowe's attorney for approximately two years; his representation of Marlowe terminated on November 1, 1976. Tr. at 34 (Apr. 23, 1986). At trial, Gans admitted that he considered himself "to have the usual relationship of an attorney and client" during the course of his representation of Marlowe and conceded that this relationship could be characterized as fiduciary. *Id.* at 35.

While the probate proceeding was pending, Marlowe, according to Gans, investigated various investment options for her anticipated inheritance. Plaintiffs' Exhibit 3 at 8–9. It appears that the stream of income Marlowe expected to derive from such investments was to be her primary source of support. *See* Plaintiffs' Exhibit 3 at 9–13. After having calculated her needs, Marlowe concluded that the investment opportunities she examined would not yield sufficient income. Plaintiffs' Exhibit 3 at 9.

Gans testified that Marlowe subsequently approached him concerning whether there was any way that he could "make [her] money useful." *Id.* In response to this request, Gans proposed that she make a direct personal loan to him without any investment responsibility on his behalf and that he would in return pay her a rate of interest sufficient to meet her income needs. *Id.* at 9–10; 17–18. It appears that Gans did not discuss with Marlowe what he intended to do with the loan proceeds. Tr. at 57 (Apr. 23, 1986); Plaintiffs' Exhibit 3 at 23. According to Gans, he used the monies received from Marlowe for "[v]arious things," mostly to pay his business and personal obligations. Plaintiffs' Exhibit 3 at 22; Tr. at 57 (Apr. 23, 1986).

Although plaintiffs assert in their complaint that Marlowe was "under the impression that the monies were to be invested by defendant for her in various ventures ...

for which she would receive a significant return," Plaintiffs' Complaint at 2, no clear evidence was elicited on this point other than a statement contained in an affidavit by Marlowe relating to a foreclosure action against Gans. In this affidavit, Marlowe stated that out of her anticipated bequest she "would invest ... about $65,000.00 in a mortgage ... which has matured and been reduced to judgment in a foreclosure action" concerning the Gans home. Plaintiffs' Exhibit 2. Gans, however, testified that all sums he received from Marlowe were "given ... as personal loans." Plaintiffs' Exhibit 3 at 17–18, 19–21, 23. Gans cited numerous instances where Marlowe, in her correspondence with Gans over the years, referred to these money transactions with Gans as "loans." *See, e.g.,* Defendant's Exhibits E, F, G, I.

It is unclear whether or not Marlowe sought and obtained independent advice, legal or otherwise, prior to entering into the financial transactions with Gans. *See, e.g.,* Plaintiffs' Exhibit 3 at 29; Tr. at 45–46, 58–59 (Apr. 23, 1986); Tr. at 34 (July 15, 1986). Although at one point Gans stated that he did not know if Marlowe was represented by independent counsel, Tr. at 45 (Apr. 23, 1986), he did alternately speculate that she may have consulted with "a man with H & R Block," Plaintiffs' Exhibit 3 at 10, or conferred with an unidentified "lawyer or an accountant." Plaintiffs' Exhibit 3 at 29; *see* Tr. at 45 (Apr. 23, 1986). It does not appear, however, that Gans advised Marlowe to seek out independent professional guidance regarding the contemplated loan transactions. Plaintiffs' Exhibit 3 at 29; *see* Tr. at 45–47 (Apr. 23, 1986). Gans at trial could not recollect if he had informed Marlowe of the apparent conflict of interest created by his entering into a financial transaction with someone who was also his client at the time. Tr. at 45–46 (Apr. 23, 1986).

Nevertheless, based on this unclear arrangement, Marlowe advanced Gans $30,000.00 on December 5, 1975. Plaintiffs' Exhibit 3 at 10–11. This was to be the first of four loans Marlowe made to Gans. Plaintiffs' Exhibit 4. Whether or not this loan was evidenced by a note or other writing at the time it was made is not clear. *See, e.g.,* Plaintiffs' Exhibit 3 at 10, 14–15. The loan was subsequently acknowledged by Gans in a letter on his law office letterhead to Marlowe on January 5, 1977. Defendant's Exhibit L; Plaintiffs' Exhibit 3 at 11–12. This letter stated that the $30,000.00 was repayable "with interest at the highest legal rate" and the principal would be due within nine months of the receipt by Gans of a written demand for payment. Defendant's Exhibit L. The letter also provided that should any payment be more than ten days late, Marlowe could declare the loan to be in default and demand that the entire amount be paid in full. *Id.*

At the time of his representation of Marlowe, Gans was experiencing financial difficulties. Tr. at 35–36 (Apr. 23, 1986); Plaintiffs' Exhibit 3 at 34. Money judgments in excess of $180,000.00 had been entered against Gans in 1975. Tr. at 36–38 (Apr. 23, 1986); Tr. at 33 (July 15, 1986). He had removed his practice from New York City to his home to cut expenses. Plaintiffs' Exhibit 3 at 34–35. A foreclosure proceeding against his Tuxedo Park home was pending. In an effort to save the home, Gans arranged to have Marlowe execute an affidavit sworn to on July 15, 1976 in which she stated that upon receipt of the proceeds of her anticipated bequest she would purchase the mortgage. Plaintiff's Exhibit 2. In support of this affidavit, Gans had Marlowe execute a letter of commitment to him and his wife in which Marlowe stated that she had agreed "to acquire all of the interests" of the mortgagees. Plaintiffs' Exhibit 1.

As promised in both her affidavit and letter of commitment, Marlowe did indeed advance the necessary monies to enable Gans to save his home. Shortly after she received the $175,000.00 bequest, Marlowe loaned Gans $66,000.00 on October 27, 1976. Plaintiffs' Exhibit 3 at 16–17. This was her second loan to Gans. Plaintiffs' Exhibit 4. This money was used by Gans' wife to purchase the mortgage at the foreclosure sale, as Gans had conveyed title to the property to his wife alone prior to the

sale. Tr. at 53 (Apr. 23, 1986); Plaintiffs' Exhibit 3 at 33.

Marlowe, however, never did acquire any mortgage interest in the Gans home which was saved by her funds from foreclosure. No clear evidence was presented by either party explaining Marlowe's failure to obtain the mortgage. In fact, Gans could not recall if he had ever given Marlowe a promissory note for the $66,000.00 loan. Plaintiffs' Exhibit 3 at 17. Gans stated at trial that he offered to give Marlowe security, Tr. at 47–49 (Apr. 23, 1986); Tr. at 33–34 (July 15, 1986), and this testimony was not rebutted.

Although plaintiffs claim that it was Marlowe's intention to acquire the mortgage, Plaintiffs' Post-Trial Memorandum of Law at 8–9 (filed December 31, 1986) [hereinafter cited as Plaintiffs' Post-Trial Memorandum], Gans asserted that Marlowe "changed her mind" about taking a mortgage on his home. Tr. at 46, 52–53 (Apr. 23, 1986). In support of this contention, Gans testified and provided written evidence in the form of a letter written by Marlowe. Tr. at 48–50 (Apr. 23, 1986); Defendant's Exhibit D. He stated that she had attempted to help Gans obtain his own mortgage on the home and, as banks were not giving mortgages at the time, she also decided not to take a mortgage on Gans' home. Tr. at 49 (Apr. 23, 1986); Defendant's Exhibit D. Furthermore, Gans testified that Marlowe did not ask for a note to evidence any loan, nor did she seek any security for these loans until some years later. Tr. at 55–56 (Apr. 23, 1986); Plaintiffs' Exhibit 3 at 19, 29. There is a letter, for example, dated February 18, 1981 written by Marlowe to Gans' wife in which she states:

> For my protection I should get a lean [*sic*] on your estate before I end up holding a empty bag. Please cooperate to avoid more trouble!

Defendant's Exhibit H.

It is also unclear to what extent Marlowe knew of Gans' precarious financial state at the time of the loans. Plaintiffs assert that not only was Marlowe unaware of Gans' difficult financial straits, but that

she would not have made the loans to him had she known. No clear evidence was offered, however, to rebut Gans' testimony that Marlowe was aware of his financial difficulties. Plaintiffs' Exhibit 3 at 30–34; Tr. at 39–42 (Apr. 23, 1986); Tr. at 29–31 (July 15, 1986). Gans, for instance, testified that Marlowe was "acquainted" with the foreclosure action against his home. Tr. at 39 (Apr. 23, 1986). This testimony would appear to be corroborated by Marlowe's affidavit used in conjunction with the foreclosure proceedings in which she says that she is "informed" that the Gans' mortgage has "matured and been reduced to a judgment in a foreclosure action." Plaintiffs' Exhibit 2; Defendant's Exhibit B. Further, by her commitment letter of July 28, 1976, Marlowe again referred to the "mortgage foreclosure action pending in the Supreme Court, Orange County, New York." Plaintiffs' Exhibit 1. Gans also testified that Marlowe accompanied him to get a mortgage from her bank and that she was present when he discussed his financial affairs with the bank. Tr. at 40 (Apr. 23, 1986); Tr. at 30–31 (July 15, 1986). The fact that Marlowe did accompany Gans when he applied for a mortgage appears to be corroborated by letter written by Marlowe to her attorney dated April 25, 1981. Defendant's Exhibit D.

Thereafter, Marlowe loaned more money to Gans, $14,950.00 on April 22, 1977, and $12,000.00 on June 7, 1977. Plaintiffs' Exhibit 4. These last two loans brought the total that Gans had borrowed over the years from Marlowe to $122,950.00. Gans made periodic interest payments to Marlowe on these loans. *See, e.g.,* Defendant's Exhibits J and K. According to a statement of indebtedness dated February 28, 1981 prepared by Gans and addressed to Marlowe, apparently in response to her request, interest in the amount of $900.00 per month had been paid by Gans to Marlowe up to June 30, 1980. Plaintiffs' Exhibit 4; *see* Plaintiffs' Exhibit 3 at 27; Defendant's Exhibits H and J. Notwithstanding Marlowe's demands for return of the principal, *see, e.g.,* Defendant's Exhibit L; Tr. at 54 (Apr. 23, 1986), no further payments were made after this date.

## DISCUSSION OF LAW

### I.

The plaintiffs contend that the four loans obtained by Gans from Marlowe are non-dischargeable debts under two theories. First, they claim that these debts were procured by false pretenses or false representations under Code Section 523(a)(2)(A) in that Marlowe was "under the impression" that her money would be invested by Gans so that she would receive a significant return on her money. Plaintiffs' Complaint at 2. To this end, the plaintiffs allege that Gans failed to disclose to Marlowe at the time he obtained this money the full extent of his financial difficulties and that he would be utilizing these funds for personal rather than investment purposes.

Second, the plaintiffs in the alternative base their dischargeability objection on Gans' alleged fraud or defalcation while acting in a fiduciary capacity within the meaning of Code Section 523(a)(4). Specifically, the plaintiffs argue that Gans, as Marlowe's attorney, breached his fiduciary duty to Marlowe in that she was his client at the time he acquired the loans and that he failed to advise her to seek independent counsel. For the reasons discussed below, this court finds the plaintiffs failed to sustain their burden of proof under both Code Section 523(a)(2)(A) and Code Section 523(a)(4).

There is a certain tension in our nation's bankruptcy laws that has long been recognized by the courts concerning the dischargeability of debts. On one hand, there is the fundamental goal to afford a deserving debtor an economic rehabilitation or "fresh start" in life. This policy is best articulated in Justice Sutherland's oft-quoted observation:

> One of the primary purposes of the bankruptcy act is to "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor ... a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt. (citation omitted.)

*Local Loan Company v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1933) quoting *Williams v. United States Fidelity & Guaranty Company*, 236 U.S. 549, 554–55, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915). *See Perez v. Campbell*, 402 U.S. 637, 648, 91 S.Ct. 1704, 1710, 29 L.Ed.2d 233 (1971); *Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970).

On the other hand, this fresh start policy is tempered by an equally important objective, that is, to prevent the dishonest "debtor's attempt to use the law's protections to shield his or her wrongdoing." *Matter of Newmark*, 20 B.R. 842, 852 (Bankr.E.D.N.Y.1982). In response to this concern, the Code provides that certain debts are excepted from discharge under specific and well-defined circumstances. The bankruptcy courts are given exclusive jurisdiction of some dischargeability actions as defined by Code Section 523(c). As mandated by this provision, this court has exclusive jurisdiction of the instant proceeding. *See, e.g., In re DiNoto*, 46 B.R. 489 (Bankr. 9th Cir. 1984).

In balancing these two objectives, courts adhere to certain "guiding" principles in analyzing a dischargeability objection brought under Code Section 523. *In re Levitan*, 46 B.R. 380, 383 (Bankr.E.D.N.Y.1985). One of these widely-recognized tenets, as this court has previously written, is that such exceptions should be literally and strictly construed against the creditor and liberally in favor of the debtor. *In re DeRosa*, 20 B.R. 307, 310 (Bankr.S.D.N.Y. 1982); *see, e.g., Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 288, 59 L.Ed. 717 (1915) ("In view of the well-known purposes of the bankrupt law, exceptions to the operation of a discharge thereunder should be confined to those plainly expressed ..."); *In re Hunter*, 780 F.2d 1577, 1579 (11th Cir.1986); *Matter of Cross*, 666 F.2d 873, 879–80 (5th Cir.1982); *Matter of Vickers*, 577 F.2d 683, 686–87

(10th Cir.1978); *In re Danns*, 558 F.2d 114, 116 (2d Cir.1977); *In re Taylor*, 514 F.2d 1370, 1373 (9th Cir.1975); *Matter of Barton*, 465 F.Supp. 918, 921 (S.D.N.Y.1979); *In re Hefner*, 69 B.R. 257, 259 (Bankr.N.D. Ala.1986); *In re Levitan*, 46 B.R. at 383; *In re Tanner*, 31 B.R. 338, 339 (Bankr.S.D. Fla.1983); *In re Materetsky*, 28 B.R. 499, 501 (Bankr.S.D.N.Y.1983); *Matter of Newmark*, 20 B.R. at 852–53.

A second time-honored principle concerns the allocation of the burden of proof. Although the Code itself is silent on this matter, the courts have uniformly imposed this burden on the party challenging the dischargeability of a debt "in apparent response to the intonations of the fresh start policy." *Matter of Newmark*, 20 B.R. at 853; *Matter of Long*, 794 F.2d 928, 930 (4th Cir.1986); *In re Black*, 787 F.2d 503, 505 (10th Cir.1986); *In re Hunter*, 780 F.2d at 1579; *In re Danns*, 558 F.2d at 116; *In re Schwartz*, 45 B.R. 354, 357 (Bankr.S.D.N. Y.1985); *In re Materetsky*, 28 B.R. at 503.

■ The third principle is that the standard of proof applied to fraud-based dischargeability actions is that of clear and convincing evidence. Thus, the plaintiff has the burden of proving each element by clear and convincing evidence. *In re Schwartz*, 45 B.R. at 357. "Clear and convincing evidence" has been identified as a "more exacting standard," *In re DeRosa*, 20 B.R. at 310, "which establishes in the mind of the trier of fact 'a firm belief or conviction as to the allegations sought to be established,' " *Matter of Hagedorn*, 25 B.R. 666, 668 (Bankr.S.D.Ohio 1982) quoting *Hobson v. Eaton*, 399 F.2d 781, 784 n. 2 (6th Cir.1968), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1189, 22 L.Ed.2d 459 (1969); *see, e.g., In re Browning*, 31 B.R. 995, 1000 (S.D.Ohio 1983); *In re Krause*, 44 B.R. 159, 161 (Bankr.N.D.Ill.1984).

■ Although these principles make a plaintiff's task "formidable" in undertaking an exception to dischargeability, they are not a "justification for abandoning good sense." *In re Houtman*, 568 F.2d 651, 656 (9th Cir.1978). Exceptions to dischargeability are to be construed in favor of the debtor only "so far as reasonable."

*In re Soika*, 365 F.Supp. 555, 556 (W.D.N. Y.1973). Once a plaintiff establishes a *prima facie* case under Code Section 523, the debtor then has the burden of going forward in defense. *Carini v. Matera*, 592 F.2d 378, 380–81 (7th Cir.1979).

II.

The plaintiffs herein ask this court to find the subject debt nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). This section provides in pertinent part:

§ 523. Exceptions to discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

From the outset, it should be noted that case law under the former Bankruptcy Act of 1898 construing Section 17a(2), 11 U.S.C. § 35(a)(2) (repealed 1978) is "entirely applicable" to proceedings brought pursuant to Section 523(a)(2)(A) of the Code, *In re Magnusson*, 14 B.R. 662, 667 (Bankr.N.D.N.Y. 1981); *In re Hunt*, 30 B.R. 425, 436 (M.D. Tenn.1983), as the Code version of this dischargeability provision is "modified only slightly" from its predecessor under the Bankruptcy Act. S.Rep. No. 989, 95th Cong., 2d Sess. 78, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5864.

Over the years, the case law has distilled five elements that must be proven to establish the nondischargeability of a debt pursuant to this section. They have been identified as follows:

(1) [T]he debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations and (5) that the creditor sustained the alleged loss and

damage as the proximate result of the representations having been made.

*Sweet v. Ritter Finance Co.*, 263 F.Supp. 540, 543 (W.D.Va.1967); *see In re Hunter*, 780 F.2d at 1579; *In re Taylor*, 514 F.2d at 1373.

This test, widely accepted by the courts, *see e.g., In re Houtman*, 568 F.2d at 655; *In re Preston*, 47 B.R. 354, 357 (E.D.Va. 1983); *In re Hunt*, 30 B.R. at 435, requires that *all* five elements be met. *See, e.g., In re Krause*, 44 B.R. at 161; *In re Stone*, 43 B.R. 377, 379 (Bankr.D.Vt.1984); *In re Cokkinias*, 28 B.R. 304, 306 (Bankr.D. Mass.1983). Thus, failure to prove any one element is fatal to a plaintiff's case.

■ As already noted, the plaintiff has the burden of proof on a dischargeability complaint. This principle applies to each of the five elements that must be proven in a dischargeability proceeding brought under Code Section 523(a)(2)(A). *Matter of Love*, 577 F.2d 344, 348 (5th Cir.1978); *In re Hunt*, 30 B.R. at 436; *In re Shrader*, 55 B.R. 608, 610 (Bankr.W.D.Va.1985); *In re Leger*, 34 B.R. 873, 877 (Bankr.D.Mass. 1983); *Matter of Wise*, 6 B.R. 867, 869 (Bankr.M.D.Fla.1980). Furthermore, the plaintiff must prove each element with clear and convincing evidence. *In re Black*, 787 F.2d 503 (10th Cir.1986); *In re Kimzey*, 761 F.2d 421 (7th Cir.1985); *In re Preston*, 47 B.R. 354 (E.D.Va.1983); *In re Self*, 51 B.R. 686 (Bankr.N.D.Miss.1985); *In re Ray*, 51 B.R. 454 (Bankr.D.Haw. 1985); *In re Jones*, 50 B.R. 911 (Bankr.N. D.Tex.1985); *In re Gallaudet*, 46 B.R. 918 (Bankr.D.Vt.1985); *In re Krause*, 44 B.R. 159 (Bankr.N.D.Ill.1984); *In re Senty*, 42 B.R. 456 (Bankr.S.D.N.Y.1984); *In re Walthall*, 38 B.R. 140 (Bankr.D.Md.1984); *In re Sobel*, 37 B.R. 780 (Bankr.E.D.N.Y. 1984); *In re Leger*, 34 B.R. 873 (Bankr.D. Mass.1983); *In re Lamb*, 28 B.R. 462 (Bankr.W.D.La.1983); *In re Satterfield*, 25 B.R. 554 (Bankr.N.D.Ohio 1982); *In re De-Rosa*, 20 B.R. 307 (Bankr.S.D.N.Y.1982).

■ While the creditor's burden of proof in this regard is "heavy," *In re Stone*, 43 B.R. at 379; *In re Lamb*, 28 B.R. at 464, upon the establishment of a *prima facie* case the burden of coming forward with a credible explanation of the alleged facts shifts to the defendant/debtor, *Carini v. Matera*, 592 F.2d at 380–81; *In re Senty*, 42 B.R. at 458; *In re Kyriazes*, 38 B.R. 353, 355 (Bankr.N.D.Ill.1983). Simply put, plaintiffs have not established with clear and convincing evidence the requisite elements needed to meet their burden of proof under Code Section 523(a)(2)(A).

Plaintiffs failed to prove with clear and convincing evidence the initial prong of the five-part test, that Gans made a false representation to Marlowe. Plaintiffs attempted to establish that Gans made various misrepresentations which can be categorized into four types.

■ The first category of misrepresentations concerned the false "impression" which Gans allegedly created that the funds he received from Marlowe were for investment purposes and not personal loans to himself. Plaintiffs' Complaint at 2. Where a debtor acquires certain monies with the condition that they are to be used only for restricted purposes and the debtor has no intention to abide by such restrictions, "then a misrepresentation clearly exists upon which a debt can be properly held to be non-dischargeable." *In re Jones*, 50 B.R. at 921; *Matter of Pappas*, 661 F.2d 82, 86 (7th Cir.1981). There is no proof, however, that the monies Gans received from Marlowe were anything other than loans. The only reference that the loans were to be used as an investment for Marlowe was a statement by her in the affidavit in opposition to the foreclosure proceedings against Gans' home. In this document, Marlowe stated that she "would invest" a portion of her legacy in the mortgage under foreclosure. Plaintiffs' Exhibit 2. This reference, however, is outweighed by numerous other references by Marlowe in her own handwriting characterizing her financial transactions with Gans as "loans." *See, e.g.,* Defendant's Exhibits E, F, G, H, I. It is, thus, not clear based on the evidence presented that Gans misrepresented to Marlowe that the monies he received from her were to be restricted for investment purposes.

The second category of misrepresentation concerns Gans' alleged failure to disclose to Marlowe the true extent of his financial difficulties. It now is generally accepted that "[u]nder appropriate circumstances, the failure to disclose information may be characterized as a misrepresentation," within the meaning of Code Section 523(a)(2)(A). *In re Hunt*, 30 B.R. at 439. *See, e.g., In re Self*, 51 B.R. at 690 (debtor's concealment may amount to misrepresentation); *In re Kramer*, 38 B.R. 80, 82 (Bankr. W.D.La.1984) (a misrepresentation "may be implied" by the debtor's conduct or silence); *Matter of Weinstein*, 31 B.R. 804, 809 (Bankr.E.D.N.Y.1983) (it is "well recognized that silence, or the concealment of a material fact, can be the basis of a false impression which creates a misrepresentation"); *Matter of Hutchinson*, 27 B.R. 247, 250 (Bankr.E.D.N.Y.1983) (a misrepresentation need not be overt); *Bonosky v. Allen*, 25 B.R. 566, 570 (Bankr.S.D.Ohio 1982) (nondisclosure may constitute misrepresentation); *In re Satterfield*, 25 B.R. at 557; *Matter of Milbank*, 1 B.R. 150, 154 (Bankr. S.D.N.Y.1979) (a "deliberately created falsehood is the same as a spoken falsehood"). However, plaintiffs must prove with clear and convincing evidence that there was a failure to disclose information.

It is unclear from the proof submitted by plaintiffs whether or not Gans informed Marlowe of the actual state of his financial affairs. The plaintiffs essentially ask this court to draw a logical conclusion that Marlowe would not have made the loans had she known of Gans's financial difficulties and that therefore Gans must have failed to inform Marlowe of his financial condition. Plaintiffs' Post-Trial Memorandum of Law at 14–15.

In his defense, Gans testified at trial that Marlowe did have some knowledge of his financial affairs. He noted, for example, Marlowe's awareness of the pending foreclosure action against his home as evidenced by her July 15, 1976 affidavit in which she made reference to this action. Plaintiffs' Exhibit 2. Gans also testified that Marlowe accompanied him to a bank to assist in obtaining a mortgage on his home and, as part of the mortgage application process, Gans disclosed both to the bank officer and to Marlowe the existence of various judgments against him. *See, e.g.,* Tr. at 29–34 (July 15, 1986). Plaintiffs offered no proof to the contrary.

Even assuming Gans did fail to disclose the actual state of his financial condition at the time the loans were made, it is still unclear whether or not this failure to disclose would in itself constitute a misrepresentation within the meaning of Section 523(a)(2)(A). There is little evidence concerning the extent of Gans' financial difficulties at the time he obtained the loans from Marlowe. Gans did testify as to the foreclosure proceeding against his home and the existence of more than $180,000.00 in money judgments that had been filed against him at the time the loans were made. It is unclear, however, whether these financial difficulties were so severe as to prevent Gans from repaying the loans.

As Collier observes, the courts will not require an overt misrepresentation where the debtor's "hopeless insolvency" at the time monies were obtained would make repayment impossible. *Collier on Bankruptcy* ¶ 523.08 at 523–49 (15th ed. 1987); *Matter of Boydston*, 520 F.2d 1098, 1101 (5th Cir.1975) (where "hopeless insolvency ... makes payment impossible, fraudulent intent may be inferred"). *See e.g., In re Ray*, 51 B.R. 454 (Bankr.D.Haw. 1985); *Matter of Schnore*, 13 B.R. 249 (Bankr.W.D.Wis.1981); *United Bank of Denver v. Kell*, 6 B.R. 695 (Bankr.D.Colo. 1980). From the date of the earliest loan, however, Gans made interest payments for approximately four and one-half years and did not file for bankruptcy relief until nearly eight years after the last loan. Had Gans been hopelessly insolvent at the time the loans were made, it is unlikely he could have avoided bankruptcy for so long a period of time.

The third category of misrepresentation concerns alleged oral representations by Gans intended to create the false impression that he had the present ability to repay the loans. Recently, Judge

Schwartzberg of this district had occasion to consider this form of misrepresentation. *In re Schwartz*, 45 B.R. 354 (Bankr.S.D.N. Y.1985). Plaintiff made several loans to a debtor-attorney in the belief that he was financially responsible and would repay the debt. Although that court found it "clear" that plaintiff had been "influenced by the debtor's oral representations as to his successful legal practice and his financial ability to repay the loans," it nevertheless concluded that these facts did not "rise to the level of nondischargeability within the meaning of 11 U.S.C. § 523(a)(2)(A)" because this subsection "expressly *excludes* from nondischargeable false pretenses, false representations, or actual fraud any 'statement respecting the debtor's ... financial condition....'" *Id.* at 356 (emphasis added). As that court observed in an earlier case:

> Oral misrepresentations or pretenses as to the financial condition of the debtor or an insider are expressly excluded from nondischargeability under subsection (A) in § 523(a)(2) because subsection (B) requires that such misrepresentations as to the debtor's or an insider's financial condition must result from the "use of a statement in writing."

*In re Kiernan*, 17 B.R. 362, 365 (Bankr.S. D.N.Y.1982). An oral misrepresentation of financial condition is not contemplated by subsection (A) of Section 523(a)(2). *See Engler v. Van Steinburg*, 744 F.2d 1060, 1060 (4th Cir.1984); *Blackwell v. Dabney*, 702 F.2d 490, 491 (4th Cir.1983); *In re Blackburn*, 16 C.B.C.2d 83, 92, 68 B.R. 870 (Bankr.N.D.Ind.1987).

The fourth category of misrepresentation asserted by plaintiffs concerns the debtor's "intended falsehood" that Marlowe "would be receiving a mortgage." Plaintiffs' Post-Trial Memorandum at 9. Citing Marlowe's affidavit prepared in connection with the foreclosure proceeding against Gans' home, plaintiffs argue that Marlowe believed that she would acquire a mortgage in return for the $66,000.00 she advanced Gans on October 27, 1976. They also cite Gans' conveyance of his joint interest in the home to his wife alone as proof of his deceptive conduct designed to thwart Marlowe from ac-

quiring a mortgage interest. In his defense, Gans testified that although Marlowe prior to making this loan did want a mortgage on his house, she subsequently "changed her mind" and no longer sought this collateral. Tr. at 46, 52–53 (April 23, 1986).

While Marlowe is deceased and Gans' explanation is self-serving, there exists nothing in the record to contradict this explanation. Notwithstanding Marlowe's affidavit indicating her intention to acquire a mortgage interest in Gans' home in exchange for her loan of $66,000.00, no other evidence, documentary or otherwise, was offered by plaintiffs to overcome Gans' testimony that Marlowe changed her mind about receiving a mortgage to collateralize the October 27, 1976 loan.

The only other indication of Marlowe's intent to acquire a mortgage that could be gleaned from the evidence was a statement written by Marlowe nearly five years after she made this loan to Gans. In a letter to Gans' wife, Marlowe wrote that she "should get a lean [sic]" to protect her financial position before she ended "up holding a empty bag." Defendant's Exhibit H. It would seem that had Marlowe truly intended to acquire a mortgage for the October 27, 1976 loan, she would have taken some remedial action sooner than five years thereafter, and in a more forceful manner than by letter to Gans' wife.

Plaintiffs appear to argue that the court may infer misrepresentation or fraud by the fact Marlowe never did acquire the mortgage. The mere lack of performance, without more, does not establish fraud. In *In re Stone*, 43 B.R. 377 (Bankr.D.Vt.1984), for example, the objecting creditor was observed to have "apparently slept on his rights" in failing to demand a mortgage which the debtor had promised to give the creditor in return for a loan. *Id.* at 380. The creditor, the court noted, had "waited almost a year and a half" before he took any affirmative action to acquire the promised mortgage. In finding the plaintiff "guilty of laches," the court reasoned that he "could have very well had the necessary

document prepared for execution by the debtor, and in the event of her refusal, he could have taken legal action to compel her to carry out her obligation." *Id.*

We cannot speculate as to why Marlowe failed to pursue her alleged intention to acquire a mortgage on Gans's home. The only credible evidence on this question was Gans' testimony that Marlowe changed her mind and no longer sought the mortgage to secure the loan.

Furthermore, even if this court were to find that Gans had promised to give Marlowe a mortgage and thereafter failed to carry out his promise, a bare promise to be fulfilled in the future does render a debt nondischargeable. *In re Schwartz*, 45 B.R. at 357; *In re Stone*, 43 B.R. at 379. "Ordinarily, a promise to perform in the future which is not carried out is actionable only in contract." *In re Firestone*, 26 B.R. 706, 715 (Bankr.S.D.Fla. 1982). *See In re Simpson*, 29 B.R. 202, 208 (Bankr.N.D.Iowa 1983) ("failure to perform some promised action, however, is not a violation of 11 U.S.C. § 523(a)(2)(A)"). The reason for this is that fraud "cannot be based on statements or promises to perform in the future, absent proof of scienter" *In re Schwartz*, 45 B.R. at 357.

Where, however, a promise is made "with a positive intent not to perform" or if the promisor "knew or should have known of his prospective inability to perform," the misrepresentation consisting of this promise may be found to be fraudulent. *In re Firestone*, 26 B.R. at 715. Nevertheless, as Judge Schwartzberg notes:

> No matter how unfounded the debtor's rose-colored optimism, the plaintiff must establish by clear and convincing evidence that the debtor had no intention of repaying her when he obtained the loans.

*In re Schwartz*, 45 B.R. at 357.

It is thus recognized that where there has been a misrepresentation coupled with deceptive conduct, the court under the totality of the circumstances may infer the requisite intent from the "proven facts." *In re Lyon*, 8 B.R. 152, 154 (Bankr.D.Me. 1981); *In re Schlickmann*, 6 B.R. 281, 282 (Bankr.D.Mass.1980) (a "representation coupled with [the debtor's] conduct is sufficient to permit the court to infer the requisite intent").

This brings us to the second element of Code Section 523(a)(2)(A). Plaintiffs ask this court to infer that Gans intended to deceive Marlowe from certain circumstances which they argue are indicative of fraudulent intent.

While intent to deceive may be inferred from the "totality of the circumstances," as one court reasoned, "there still must be evidence of the circumstances which the plaintiff believes present a picture of deceptive conduct." *In re Leger*, 34 B.R. at 878. Intent may be inferred, it cannot be presumed. *Matter of Kinney*, 54 B.R. 348, 352 (Bankr.M.D.Fla.1985).

Although intent is a question of fact involving a state of mind, *Gabellini v. Rega*, 724 F.2d 579, 581 (7th Cir.1984); *Carini v. Matera*, 592 F.2d at 380; *In re Beleau*, 35 B.R. 259, 262 (Bankr.D.R.I. 1983), there is ample authority for courts to infer intent since "[d]irect proof of fraudulent intent is rarely available." *In re Schlickmann*, 6 B.R. at 282; *In re Firestone*, 26 B.R. at 717. *See, In re Cullen*, 63 B.R. 33, 35 (Bankr.E.D.Mo.1986); *In re Golden*, 54 B.R. 957, 963 (Bankr.D.Mass. 1985); *In re Senty*, 42 B.R. at 459; *In re Bono*, 41 B.R. 629, 631 (Bankr.D.Mass. 1984); *In re Kramer*, 38 B.R. at 83; *In re Beleau*, 35 B.R. at 262; *In re Leger*, 34 B.R. at 877; *Matter of Hutchinson*, 27 B.R. at 251; *Matter of Misjak*, 26 B.R. 914, 916 (Bankr.W.D.Wis.1983).

Particular acts or circumstances from which courts have inferred an intent not to pay include, for example, the time period between the debtor's incurrence of the obligation and the filing of the bankruptcy case; whether the debtor had the means to repay at the time the liability was incurred; and whether the debtor consulted with an attorney prior to obtaining the loan. *See, e.g., In re Blackburn*, 16 C.B.C.2d 83, 68 B.R. 870 (Bankr.N.D.Ind.1987); *In re Cullen*, 63 B.R. at 35; *In re Shrader*, 55 B.R. 608 (Bankr.W.D.Va.1985); *In re Ray*, 51

B.R. 454 (Bankr.D.Haw.1985); *In re Senty*, 42 B.R. 456 (Bankr.S.D.N.Y.1984); *In re Kramer*, 38 B.R. 80 (Bankr.W.D.La.1984); *In re Griffis*, 29 B.R. 110 (Bankr.D.Vt. 1983); *Matter of Hutchinson*, 27 B.R. 247 (Bankr.E.D.N.Y.1983); *In re Satterfield*, 25 B.R. 554 (Bankr.N.D.Ohio 1982); *Matter of Schnore*, 13 B.R. 249 (Bankr.W.D.Wis. 1981).

■ Although none of these factors alone would be dispositive, *see, e.g., In re Shrader*, 55 B.R. at 611; *Matter of Carpenter*, 53 B.R. 724, 730 (Bankr.N.D.Ga. 1985), the plaintiffs here failed to prove the existence of any such factors from which this court may infer a fraudulent intent by the debtor. As noted earlier, nearly eight years elapsed between the date of Marlowe's last loan to Gans on June 7, 1977 and the date on which Gans filed his Chapter 7 petition. The plaintiffs also failed to submit clear and convincing proof that Gans, at the time he received the loans from Marlowe, was not in a position to repay them. The pendency of a foreclosure proceeding and the existence of money judgments in the approximate amount of $180,000.00 against Gans, without more, does not establish that he was hopelessly insolvent.

The record reveals no fraudulent intent at or prior to the time the loans were made, nor any bad faith in Gans' dealings with Marlowe. There is no evidence that Gans' obligation to repay the loans to Marlowe was made with the intent not to perform. To the contrary, the evidence, for example, shows that Gans made interest payments on the loans for a substantial period of time before he defaulted. Payments on the first loan were made for more than four years, whereas payments on the last loan were made for approximately three years before they ceased.

In *Matter of Schnore*, 13 B.R. 249 (Bankr.W.D.Wis.1981) the debtor was held to have defrauded his creditors because he was found to have been insolvent at the time the liabilities were incurred and thus could not have reasonably believed that he would be able to meet these obligations. The court also noted the debtor's "failure

to make any payment whatsoever" as being "strong evidence that he did not intend to pay" his creditors. *Id.* at 257. In contrast, where a debtor subsequently does make payments to the lender, the court will consider this evidence as indicative of the debtor's lack of fraudulent intent. *See, e.g., In re Schwartz*, 45 B.R. 354 (Bankr.S. D.N.Y.1985).

■ Nor can this court find that the attorney-client relationship between Gans and Marlowe, coupled with an alleged conflict of interest relating to the financial transactions, form a sufficient basis from which fraudulent intent can be inferred. Inferring fraud based on the relationship of the parties has been rejected by this district as a "novel assertion." *Matter of Barton*, 465 F.Supp. at 921. "Fraud implied in law from the relation of the parties alone, 'which may exist without imputation of bad faith or immorality, is insufficient' to bar discharge...." *Id.* at 921 quoting 1A *Collier on Bankruptcy* ¶ 17.16[3] at 1634 (14th ed. 1976). This observation reflects case law that to prevail on a dischargeability objection, the creditor must establish that the debtor is guilty of positive fraud or fraud in fact. *In re Black*, 787 F.2d at 505; *In re Hunter*, 780 F.2d at 1579 (11th Cir.1986); *In re Harris*, 458 F.Supp. 238, 242 (D.Ore.1976).

■ The plaintiffs, nevertheless, argue that a " 'picture of deceptive conduct' " exists by virtue of the fact that Gans neither advised Marlowe, an unsophisticated lender, to seek independent counsel, nor informed her of the apparent conflict of interest presented by their attorney-client relationship. Plaintiffs' Post-Trial Memorandum at 14 quoting *Matter of Misjak*, 26 B.R. at 916. A lender's relative lack of business acumen in conjunction with an apparent conflict of interest between the lender and debtor are elements considered by the courts under Section 523(a)(2)(A). *See, e.g., Matter of Barton*, 465 F.Supp. 918 (S.D.N.Y.1979); *In re Barton*, No. 76 B 574, slip op. (S.D.N.Y. Dec. 7, 1977). However, these factors alone do not provide sufficient proof of fraudulent intent. For instance, in *Matter of Barton*, the ob-

jecting creditor loaned substantial sums to a corporation owned and operated by the creditor's attorney, Barton, who had personally guaranteed the loans. After Barton filed for bankruptcy, the creditor objected to the dischargeability of the debt on several grounds. Noting that Barton had not concealed his conflict of interest from his creditor-client, the court held that the mere existence of the conflict of interest would not support an objection to dischargeability upon false pretenses or false representations absent "proof of specific, intentional false pretenses or false representations." *Matter of Barton*, 465 F.Supp. at 921.

The plaintiffs here rely on a related case against Barton in which the element of fraudulent intent was established. *In re Barton*, No. 76 B 574, slip op. (S.D.N.Y. Dec. 7, 1977). In this unpublished decision, the court found the plaintiffs had been induced to invest with Barton monies for a specified purpose and that these funds had not been so applied. The plaintiffs paid Barton to advise them how to invest certain settlement proceeds received through Barton's representation of them as their attorney in negligence actions. In an effort to avoid the appearance of self-dealing, Barton arranged to have another attorney participate in the execution of the investment documents. In excepting the debt from dischargeability, the court focused on the concealment of Barton's conflict of interest from his creditor-clients as being indicative of his fraudulent intent. The arrangement was deemed to be no more than a "charade" by which the plaintiffs were "lured unsuspectingly into this unfortunate enterprise." *Id.* at 6, 7.

Plaintiffs here failed to show with clear and convincing evidence any deceptive conduct beyond Gans' apparently undisclosed conflict of interest with his client and his failure to advise Marlowe to seek independent advice. From the evidence adduced at trial, there appears to have been no attempt by Gans to disguise the conflict of interest. It also appears, based on Gans' uncontradicted testimony, that he neither advised nor cajoled Marlowe into making loans to him. And, although vague, Gans did testify that Marlowe may have indeed consulted independent advisors regarding her loans to Gans. Accordingly, plaintiffs failed to establish by clear and convincing evidence Gans' fraudulent intent. Having found that the plaintiffs failed to prove either the false representation or intent elements of Section 523(a)(2)(A) with clear and convincing evidence, plaintiffs did not establish all of the requisite elements of this exception to dischargeability.

### III.

Plaintiffs' remaining dischargeability objection pursuant to Code Section 523(a)(4) alleges that Gans committed fraud or defalcation while acting in a fiduciary capacity. Case law interpreting Section 17a(4) of the Bankruptcy Act of 1898, 11 U.S.C. § 35(a)(4) (repealed 1978), the predecessor of Code Section 523(a)(4), is applicable to Code cases as the language of both provisions is "almost identical." *In re Paley*, 8 B.R. 466, 468 (Bankr.E.D.N.Y.1981). This dischargeability provision has for more than a century been construed narrowly and strictly by the Supreme Court. *See, e.g., Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *Upshur v. Briscoe*, 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931 (1891); *Chapman v. Forsyth*, 43 U.S. (2 How.) 202, 11 L.Ed. 236 (1844). The lower courts have, accordingly, adhered to this principle of strict construction. *See, e.g., Matter of Angelle*, 610 F.2d 1335, 1338–39 (5th Cir.1980); *In re Harris*, 458 F.Supp. 238, 243 (D.Ore.1976); *In re Lipke*, 54 B.R. 704, 705 (Bankr.W.D.Wis. 1985); *In re Schultz*, 46 B.R. 880, 884–85 (Bankr.D.Nev.1985); *In re Levitan*, 46 B.R. 380, 385–86 (Bankr.E.D.N.Y.1985); *In re Materetsky*, 28 B.R. 499, 501 (Bankr.S. D.N.Y.1983); *Matter of Wise*, 6 B.R. 867, 870–71 (Bankr.M.D.Fla.1980); *In re Miles*, 5 B.R. 458, 460 (Bankr.E.D.Va.1980).

Beginning with its earliest cases construing the concept of fiduciary, the Supreme Court, in an effort to promote the bankruptcy law's "fresh start" policy, gave "limited meaning to the term fiduciary." *Matter of Angelle*, 610 F.2d at 1339. In *Chapman*, for example, the Supreme

Court considered the issue of whether or not a factor who retains the money of the principal is a fiduciary within the context of the bankruptcy laws. In finding that the factor's debt was dischargeable, the Court wrote:

> If the [Bankruptcy] act embrace such a debt, it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this *is not* the relation spoken of in the first section of the act.

*Chapman v. Forsyth*, 43 U.S. (2 How.) at 208 (emphasis added).

█ Thus, a distinction must be made between a true fiduciary relationship and a relationship that is in reality a debtor-creditor arrangement. The concern here is that the definition of fiduciary be narrowly construed so that it "not reach commercial debtor-creditor transactions in which the debtor merely violated the terms of his agreement with the creditor." *In re Levitan*, 46 B.R. at 385. As a result, the "traditional" or general meaning of fiduciary, that is, a person who stands in a special relation of good faith, trust and confidence, is "far too broad for the purposes of bankruptcy law." *Matter of Rausch*, 49 B.R. 562, 564 (Bankr.D.N.J.1985); *In re Schultz*, 46 B.R. at 884.

█ The question of who is a fiduciary is to be determined under federal law. *In re Black*, 787 F.2d at 505; *In re Johnson*, 691 F.2d 249, 251 (6th Cir.1982); *In re Pedrazzini*, 644 F.2d 756, 758 (9th Cir. 1981); *Matter of Angelle*, 610 F.2d at 1341; *In re Schultz*, 46 B.R. at 884; *In re Paley*, 8 B.R. at 469. State law, nevertheless, is relevant to the issue. *In re Black*, 787 F.2d at 506; *In re Johnson*, 691 F.2d at 251; *Matter of Schnitz*, 52 B.R. 951, 955

(W.D.Mo.1985); *In re Lipke*, 54 B.R. at 706; *In re Schultz*, 46 B.R. at 884.

█ Several factors are considered in determining whether or not a debt was incurred while acting in a fiduciary capacity. One requires that the trust relationship exist prior to the act creating the debt and "without reference thereto." *Davis v. Aetna Acceptance Co.*, 293 U.S. at 333, 55 S.Ct. at 154; *In re Johnson*, 691 F.2d at 251; *Matter of Angelle*, 610 F.2d at 1338–39; *Matter of Dloogoff*, 600 F.2d 166, 168 (8th Cir.1979); *In re Paley*, 8 B.R. at 469.

Second, the wrongful act creating the debt must have been done during the course of the fiduciary relationship. *In re Livingston*, 40 B.R. 1018, 1019–20 (E.D. Mich.1984); *In re Wolfington*, 47 B.R. 762, 764 (Bankr.E.D.Pa.1985); *In re Gelman*, 47 B.R. 735, 737–38 (Bankr.S.D.Fla.1985). Third, this "special debt" that arises from breach of a fiduciary duty, *In re Johnson*, 691 F.2d at 251, is distinguished in that it is based on an express, technical or statutory trust. *Matter of Schnitz*, 52 B.R. at 955–56; *In re Owens*, 54 B.R. 162, 164 (Bankr. D.S.C.1984); *In re Materetsky*, 28 B.R. 499, 501–02 (Bankr.S.D.N.Y.1983); *Matter of Lucas*, 21 B.R. 585 (Bankr.W.D.Pa.1982), *aff'd sub nom., American Insurance Company v. Lucas*, 41 B.R. 923 (W.D.Pa. 1983); *In re Kirk*, 8 B.R. 258, 259 (Bankr.E.D.Va.1981); *In re Williams*, 2 C.B.C.2d 796, 799 (Bankr.W.D.Va.1980). As one court explained:

> Simply because one is supposed to do something and doesn't and even if one does not pay for property of another trusted to him, a fiduciary capacity has not existed, in the bankruptcy sense, in the first place.

*In re Kirk*, 8 B.R. at 259.

Thus, excluded from the ambit of Section 523(a)(4) are debts arising from equitable trusts or trusts implied in law. *Matter of Schnitz*, 52 B.R. at 955; *In re Owens*, 54 B.R. at 164.

█ As a "general rule" an express or technical trust is created by an agreement between the parties to impose a trust relationship. *In re Levitan*, 46 B.R. at 384.

The mere fact that an agreement contains the word "trust" or words similar thereto will not, without more, create a trust agreement, nor will any attendant fiduciary relationship be found to exist. *Davis v. Aetna Acceptance Co.*, 293 U.S. at 334, 55 S.Ct. at 154; *In re Lipke*, 54 B.R. at 705; *In re Shultz*, 46 B.R. at 885; *In re Paley*, 8 B.R. at 469. "If a relationship is in reality a debtor-creditor relationship it should be recognized as such regardless of the label attached to it by the parties." *In re Lipke*, 54 B.R. at 705.

A fourth factor integral to the determination of whether or not a fiduciary debt exists is that the money or property on which the debt is based must have been *entrusted* to the debtor-fiduciary. *Matter of Barton*, 465 F.Supp. at 923. Typically, this means that there was a "clear intention" by the parties to create a definable trust *res. In re Schultz*, 46 B.R. at 884–85; *Matter of Cross*, 666 F.2d 873, 881 n. 12 (5th Cir.1982); *In re Pedrazzini*, 644 F.2d at 759; *In re Thornton*, 544 F.2d 1005, 1007 (9th Cir.1976); *In re Livingston*, 40 B.R. at 1019; *Matter of Storms*, 28 B.R. 761, 764 (Bankr.E.D.N.C.1983); *In re Nova Real Estate Investment Trust*, 23 B.R. 62, 66–67 (Bankr.E.D.Va.1982). The significance of this requirement is explained as follows:

> There are important distinctions to be noted between the trustee-beneficiary relationship and that of debtor and creditor. A trust involves a duty of the fiduciary to deal with particular property for the benefit of another. The beneficiary of the trust has an equitable interest in the trust property and is, in fact, its equitable owner. The debtor-creditor relationship, on the other hand, involves only the obligation to pay money; it endows the creditor with merely a personal claim against the debtor.

*In re Nova Real Estate Investment Trust*, 23 B.R. at 66–67.

Ultimately, the "key element" implicit in the existence of a fiduciary relationship is the "intent to create a trust relationship, rather than a contractual relationship." *In re Schultz*, 46 B.R. at 885; *In re Thornton*, 544 F.2d at 1007; *In re Levitan*, 46 B.R. at 384 ("the basic prerequisite to the creation of a trust is that the parties intend to create a fiduciary relationship with respect to the property").

The rationale for applying such a strict, well-defined interpretation to fiduciary debts within the meaning of Section 523(a)(4) can perhaps be explained by the corresponding broad definition of fiduciary defalcation. Having once established that a fiduciary relationship exists, it merely need be shown that the underlying trust fund was used for a purpose other than that contemplated by the trust to constitute defalcation. *See, e.g., In re Matheson*, 10 B.R. 652, 656 (Bankr.S.D.Ala.1981).

Proof of defalcation does not require evidence of any intentional wrong by the debtor. Whereas fraud under the Bankruptcy Code "refers to positive fraud, involving moral turpitude," *In re Materesky*, 28 B.R. at 502, defalcation is broadly defined to include "the failure of a fiduciary to account for money he received in his fiduciary capacity" regardless of the fact that such failure may have resulted from ignorance or negligence. *In re Wolfington*, 47 B.R. at 764 (it "is irrelevant that the default by the fiduciary was innocent"); *In re Gonzales*, 22 B.R. 58 (Bankr. 9th Cir.1982); *In re Owens*, 54 B.R. at 165. *See, e.g., Hamby v. St. Paul Mercury Indemnity Co.*, 217 F.2d 78 (4th Cir.1954) (real estate agent's misappropriation of entrusted funds is defalcation); *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir.1937) (money used by a receiver in mortgage foreclosure action allocated to him prior to expiration of time for appeal constitutes defalcation); *In re Livingston*, 40 B.R. 1018 (E.D.Mich.1984) (insurance agent's failure to remit premiums constitutes fiduciary defalcation); *In re Wolfington*, 47 B.R. 762 (Bankr.E.D.Pa.1985) (real estate agent's use of escrow funds is breach of fiduciary duties).

It is axiomatic that the attorney-client relationship is a fiduciary relationship. Where a debtor-attorney is found to have breached the fiduciary duty to the client, any debt arising within the fiduciary

relationship may be nondischargeable pursuant to Section 523(a)(4). *See, e.g., In re Kane,* 48 F.2d 96 (2d Cir.1931) (bankrupt-attorney's conversion of client's money is fiduciary fraud); *In re Barton,* 76 B 574, slip op. at 8 (S.D.N.Y. Dec. 7, 1977) (bankrupt-attorney found to have violated his "fiduciary status as an attorney and self-styled investment adviser"); *In re Gelson,* 12 F.Supp. 924 (E.D.N.Y.1935) (bankrupt-attorney's use of clients' funds constitutes fiduciary fraud); *In re Gelman,* 47 B.R. 735 (Bankr.S.D.Fla.1985) (debtor-attorney breached fiduciary duty by allowing statutes of limitations to expire on plaintiff's causes of action); *In re Sparrow,* 30 B.R. 278 (Bankr.S.D.Fla.1983) (debtor-attorney's mismanagement of funds held in escrow constitutes defalcation while acting in fiduciary relationship).

■ Having once established that an attorney-client relationship exists, a court must then determine whether or not the debt arose from a breach of the debtor-attorney's fiduciary duty to the client. The plaintiffs here established through the defendant's own admission that an attorney-client relationship existed between him and Marlowe. What is not clear, however, is whether the debt to Marlowe arose from a breach of fiduciary obligations Gans owed as her attorney.

The Supreme Court confronted a situation where a bankrupt entered into an arrangement appointing himself as "attorney-in-fact" to receive monies for the benefit of another. *Upshur v. Briscoe,* 138 U.S. 365, 366, 11 S.Ct. 313, 314, 34 L.Ed. 931 (1891). This agreement obligated the attorney to make periodic payments reflecting a specified annual rate of interest to the client's daughter during her lifetime. In the event of her death, he was to pay the principal sum to her issue and if she died without issue, the principal would be paid to the client. The agreement specifically provided that the attorney "accepts this appointment and trust" and referred to him as the "trustee" for the client's daughter. *Id.* at 365–67, 11 S.Ct. at 313–14. Notwithstanding the trust-like terms of this arrangement, the Court found that the attorney's failure to make the required payments constituted a breach of contract rather than a breach of a fiduciary trust. As the bankrupt attorney was "absolutely and unconditionally" bound to pay interest on the money as long as he held it, the Court concurred with the lower court's conclusion that "[t]his, unquestionably, implied the right to use the money, and to use it as his own; for no authority is given to make particular investments of it for account of the beneficiary...." *Id.* at 373, 11 S.Ct. at 316.

Although the Court noted that "[p]resumably" the bankrupt could not have met his obligations under this arrangement to pay interest without investing the monies he received from his client, the Court, nevertheless, observed that the bankrupt was under no obligation to invest these funds. The Court elaborated:

> The right to use it [the funds obtained by the bankrupt-attorney from his client] in any way [the bankrupt] thought proper was repugnant to the idea of any fiduciary relation to the money, for there was no obligation upon him to keep it separate from his own money, or to put upon it any marks of identification or to invest it in any particular securities. The statement in the paper signed by Andrews [the client], that Briscoe [the bankrupt] accepts the "trust," the statement in the paper signed by Briscoe, that he accepts the "mandate," and the statement in the paper signed by Annie M. Andrews [the client's daughter], that she accepts the appointment of Briscoe "as her trustee," do not create a "trust" in its technical sense, or make the debt of Briscoe one created by him while acting in a "fiduciary character." The relation created was merely the usual one of contract between debtor and creditor. Within the meaning of the exception in the Bankruptcy Act, a debt is not created by a person while acting in a "fiduciary character," merely because it is created under circumstances in which trust or confidence is reposed in the debtor, in the popular sense of those terms.

*Id.* at 375, 11 S.Ct. at 316.

■ The facts of our case are similar to those in *Upshur.* In both cases, an attor-

ney obtained what in essence was a personal loan from a client, notwithstanding attempts by the client to characterize the arrangement as a trust in *Upshur* or an investment as in our case. Also, as in *Upshur*, there were no restrictions placed on how the loan proceeds were to be used by the attorney, other than the obligation to pay interest and to return the principal as required. In our case, the intent to create a trust was not clearly expressed, nor were any trust-like duties imposed on Gans. It may very well be a violation of an attorney's professional ethics to enter into a business or financial transaction with a client if the attorney's interests are adverse to those of the client. *See, e.g.*, Model Rules of Professional Conduct Rule 1.8 (1983); New York Code of Prof. Resp. DR5–104(A), McKinney's Judiciary Law App. (Supp.1987). However, in the absence of any requirement to segregate the monies obtained or otherwise provide that the monies were to be held in trust, this court can only conclude, compatible with the holding in *Upshur*, that the arrangement between Gans and Marlowe was no more than that of debtor and creditor. As this district has held:

> The intent of the statute, as connoted by these words, requires, as a threshold, that the bankrupt hold property in trust. The cases … regarding attorneys as fiduciaries are united in their prohibition of attorney conduct that affects funds or other property *entrusted* to the attorney, under a retained claim of equitable title by the client.

*Matter of Barton*, 465 F.Supp. at 923 (original emphasis). *See also, Matter of Vickers*, 577 F.2d 683, 687–88 (10th Cir.1978) ("'fiduciary capacity' … refers to money or property entrusted by one to another"); *Matter of Schnitz*, 52 B.R. 951, 955 (W.D. Mo.1985).

The plaintiff has the burden of proof in a dischargeability proceeding under Code Section 523(a)(4). *Matter of Cross*, 666 F.2d at 880; *Matter of Schnitz*, 52 B.R. at 955. The standard of proof required is that of clear and convincing evidence. *In re Gelman*, 47 B.R. at 737. Having failed to establish with clear and convincing evidence the breach of a fiduciary duty by Gans with respect to the debt at issue, plaintiffs have not met their burden of proof.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of this complaint pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding as provided by 28 U.S.C. § 157(b)(2)(I).

2. The plaintiffs have failed to sustain their burden of proving by clear and convincing evidence the elements essential to establish the nondischargeability of their claim under 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(4).

3. The debt owing to plaintiffs by the debtor-defendant is dischargeable. The complaint is dismissed.

An appropriate order shall be entered in conformity herewith.